## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-00181-CKK** |
| | : | |
| **DANIEL RAY CALDWELL** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

### MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of pretrial detention that the defendant, Daniel Ray Caldwell, continue to be detained pending trial as there are no conditions or combinations of conditions which can effectively ensure the defendant's appearance or the safety of any other person and the community, pursuant to 18 U.S.C. § 3142(e).

The government respectfully requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the status hearing, be considered in the Court's determination regarding pre-trial detention.

### PROCEDURAL POSTURE

The defendant was arrested in Texas on February 10, 2021. He appeared before Magistrate Judge Kimberly C. Priest Johnson in a detention hearing on February 22, 2021 and continued to March 4, 2021. Judge Johnson issued an order of detention pending trial and a commitment to another district while the defendant was remanded to the custody of the U.S. Marshals for transport to the District of Columbia (attached as Exhibit A).

On March 3, 2021, an indictment was returned with respect to Caldwell, charging him with following seven counts:

1. Obstruction of Law Enforcement During Civil Disorder (18 U.S.C. § 231(a)(3)) (5 year max);
2. Inflicting Bodily Injury on Certain Officers (18 U.S.C. § 111(a)(1), and (b)) (20 year max);
3. Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(1), (b)(1)(A)) (10 year max);
4. Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(2), (b)(1)(A)) (10 year max);
5. Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(4), (b)(1)(A)) (10 year max);
6. Violent Entry and Disorderly Conduct on Capitol Grounds (40 U.S.C. § 5104(e)(2)) (6 month max)
7. Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F)) (6 month max).

## FACTUAL BACKGROUND

**1. The Attack on the United States Capitol on January 6, 2021**

The government hereby proffers that, two months after the November 3, 2020 presidential election, on January 6, 2021, a joint session of the United States Congress convened at the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election. The joint session began at approximately 1:00 p.m., with then–Vice President Mike Pence presiding. By 1:30 p.m., the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to resolve an objection raised in the joint session. Vice President Pence continued to preside in the Senate chamber.

As the House and Senate proceedings took place, a large crowd of protestors gathered outside the Capitol. "[T]emporary and permanent barricades were in place around the exterior of the . . . building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside." Shortly after 2:00 p.m., a violent mob of rioters "forced entry" into the Capitol, and mayhem broke out inside the building, putting an hours-long halt to the electoral vote count while elected representatives, congressional staff, and members of the press hid from the mob. The joint session, and thus the constitutional ritual of

confirming the results of the 2020 Presidential Election, "was effectively suspended until shortly after 8:00 p.m."

### 2. Daniel Caldwell's Criminal Conduct

After receiving tips, including two Youtube videos posted by @chris_sigurdson titled, "Storm The Capitol w/ dream floral", viewing United Stated Capitol Police video, bodyworn camera footage and a ProPublica video where Caldwell gives an interview recalling his actions at the Capitol, the FBI was able to identify Caldwell.

Video obtained from United Stated Capitol Police shows Caldwell, wearing an olive drab in color hoodie, dark glasses on a camouflage hat, camouflage assault pack, and camouflage trousers, yelling and flipping off Officers in the police line shortly before unleashing a mist of pepper spray/mace, while moving his hand from left to right in an attempt to get the entire line of officers.

Subsequently, in an interview at the Renaissance Hotel in Arlington, Virginia, wearing the same clothing he was seen wearing earlier, this time with a red sticker on the left breast that read "Guns SAVE Lives" sticker on his sweatshirt. Caldwell recalled that a large fight broke out and a female was hit in the neck. Caldwell said that individuals stayed in the area and police were spraying mace towards him. Caldwell then threatened the officers using spray to deploy the individuals in the area and meant to disperse the angry crowd by yelling back to them that if they continued, he would return spray. Once the officers sprayed him, Caldwell sprayed toward police officer and believed he sprayed around 15 officers. Caldwell stated that officers then shot him with a big cannon with rubber bullets. This showed a complete lack of respect for the role of law enforcement, in which officers were attempting to stymie further chaos on the scene and Caldwell responded with further violence and anger.

After interviewing witnesses who were able to identify Caldwell, W1 described the individual as a "huge white supremacist" and was "a complete wacko." While playing Airsoft Military Simulation (MilSim), which is a live-action, in person simulation of armed conflict scenarios conducted by civilians that involve airsoft plastic projectiles launched be replica weapons, but do not involve actual firearms, according to W1, the individual would bring a real firearm to the course and had to be corrected on multiple occasions to return the firearm to his vehicle. Another witness, W2, stated that IT felt discriminated against in the MilSim events and referred to Caldwell as being a "dickhead" to IT. Specifically, Caldwell's group would talk loudly about having real firearms in their vehicles around W2 and would shoot W2 an excessive amount of times in an attempt to intimidate W2.

Pursuant to a lawfully-obtained search warrant, law enforcement was able to recover from the defendant's premise the camouflage backpack with unique patch. From his vehicle, the dark tinted sunglasses were recovered, which Agent Webb testified were specialized gear to create a protective barrier from things harming the eye. Order of Detention at 4, United States v. Caldwell, 21-MJ-00107-KPJ (E.D. Tex. March 5, 2021), ECF No. 11. Caldwell came prepared not just with pepper spray/mace, but also with protective gear to protect his eyes, knowing full well his activities would involve him getting sprayed in returned. At the time of his arrest, he was wearing the wearing the 5.11 hoodie, which were the items Caldwell was seen wearing at the Capitol on January 6th.

## LEGAL STANDARD

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182

F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)). Thus, a detention hearing must be held at the government's request only "in a case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B). The BRA "requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *Salerno*, 481 U.S. at 755.

The charges brought against Caldwell triggered a detention hearing under 18 U.S.C. 3142(f)(1)(A) ("crime of violence"), defined broadly as "an offense that has as an element of … physical force" or a felony that "by its nature, involves a substantial risk that physical force against the person or property of another." 18 USC § 3156(a)(4). This case also involves "a serious risk that such person will flee." 18 U.S.C. § 3142(f)(2)(A). Accordingly, the Court "shall hold a hearing to determine whether any condition or combination of conditions … will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. 3142(f). The Court held such a hearing in the Eastern District of Texas on February 22, 2021 and March 4, 2021.

Having reviewed the evidence in this case, Magistrate Judge Johnson found that pursuant to 18 U.S.C. § 3142(e)(3), there is a rebuttable presumption that no condition or conditions will reasonably assure the appearance of the defendant and the safety of the community because there is probable cause the defendant committed an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a term of imprisonment of 10 years or more is attached. Order of Det. 2, ECF No. 11. To

determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the judicial officer shall consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(l)-(4). Magistrate Judge Johnson reviewed such factors and made the appropriate decision to detain the Defendant.

## **ARGUMENT**

**A.**     **The Defendant is not entitled to a second detention hearing.**

Defendant has not yet filed a motion on this issue, but indicated his desire to hold a second detention hearing in the District of Columbia. This request is beyond the bounds of 18 U.S.C § 3145(b), which does not permit a second detention hearing, but allows the party to file a motion for revocation or amendment of the order of detention.

Additionally, 18 U.S.C § 3142(f)(2)(B) allows for a party move to "reopen[]" a detention hearing at any time before trial where the movant proffers evidence (1) unknown to him/her at the time of the detention hearing,  and (2) that has a material bearing on the detention question.  New and material information "'consists of something other than a defendant's own evaluation of his character or the strength of the case against him'; instead, it must consist of 'truly changed circumstances, something unexpected, or a significant event.'"  *United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020) (quoting *United States v. Esposito*, 354 F. Supp. 3d. 354, 359 (S.D.N.Y. 2019)).  Furthermore, the Courts have held that a party can seek reopening only before the judicial officer who made the initial detention determination.  *See United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003).  The defendant in *United States v. Cannon*, 711 F. Supp. 2d 602, 603 (E.D.

Va. 2010 was denied a second detention hearing after having a detention hearing in another district. The court there rejected the defendant's claim that either Fed. R. Crim. P. 40 or the Bail Reform Act allowed a second detention hearing in the "charging district." *Id.* at 604-07. The Defendant should be given an opportunity to have another detention hearing in this matter.

**B.      The Court should continue to hold the Defendant pursuant to 18 U.S.C. § 3142(e)**

The United States submits that there continue to be no condition or combination of conditions the Court could impose that would reasonably assure the safety of the community or the appearance of the defendant, which is in line with Magistrate Johnson's decision pursuant to 18 U.S.C. § 3142(e)(3), in which the factors under 18 U.S.C. § 3142(g)(1-4) were considered. The Court should continue to deny release pursuant to those factors.

*(1) The Nature and Circumstances of the Offense Charged*:

The defendant has been charged with grave offenses. He forcibly entered and remained on the Capitol grounds and by his actions, worked to delay and hinder Congress's certification of the Electoral College vote. He was at the front of the crowd talking to and flipping off officers, taunting them before deciding to unleash spray on a large group of officers, knowing full well the effect of prolonged spray on the officers who were trying to calm and disperse an angry crowd.

Screenshot from Capitol Police video showing Caldwell flipping off and yelling at Officers:



Picture of Caldwell spraying the crowd, as captured by photographer Stephen Voss, https://www.politico.com/news/magazine/2021/01/07/capitol-storming-siege-congress-inside-first-person-oral-history-455715:



Instead of showing remorse for his actions, he touted his efforts in the ProPublica video by proudly stating he threatened the officers for spraying the crowd by returning spray back to them. As stated by Chief Judge Beryl A. Howell, "[t]he actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law." *See United States v. Chestman*, 21-mj-218

(BAH), ECF No. 23, at *13, 16 (D.D.C. February 26, 2021) ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification").

   *(2) The Weight of Evidence Against the Person*:

   Substantial evidence supports the position that Caldwell poses a threat to the community. Caldwell's violent actions at the Capitol were captured on film, through United States Capitol Police video, social media footage, and an interview given by Caldwell himself. Caldwell confirmed his presence at the Capitol and then recounted with pride the actions taken in retaliation for officers who were trying to maintain peace and trying to disperse an angry crowd that had already caused an immense amount of violence and destruction. The weight of the evidence thus strongly supports a finding that no conditions of release would protect the community.

   *(3) History and Characteristics of the Person*:

   The United States adopts the factual proffer related to the defendant's history and characteristics in the February 14, 2021 pretrial services report generated by Tiffany Routh, United States Probation Officer in Texas. The Defendant has a 2006 conviction for Driving While Intoxicated in Newburgh Town, New York, a 2008 conviction for Disorderly Conduct and Assault Causes Bodily Injury – Family Violence from The Colony, Texas, and a 2013 conviction for Driving While Intoxicated and Resisting Arrest in Denison, Texas. As described in Magistrate Judge Johnson's order, several third-party custodians were presented by defense as suitable places for Caldwell to live. However, Ms. Caldwell, the Defendant' ex-wife would not provide details of the Defendant's estrangement from his mother and two brothers. Order of Det. 5, ECF No. 11. Ms. Caldwell gave hesitated answers to whether she ever heard the Defendant make racist comments. In contradiction of her interview with Agent Webb at the time the search warrant of their premise

was executed, Ms. Caldwell admitted in the detention hearing that the Defendant had previous DUIs and that the police were called due to a domestic situation in which things "escalated", according to her view. In contrast, the police detailed that the Defendant slammed Ms. Caldwell's on a table, straddled her, picked her back up, sat her back down and picked her up again. She was confronted with the fact that the she was not able to call 911 because the Defendant ripped the phone from the wall and once confronted with this information, she admitted she sought a restraining order and began divorce proceedings against the defendant. *Id.* at 5-6. She admitted that the Defendant owned nineteen firearms, two of which belong to her. Although these firearms are now at her daughter's house, the large number of firearms owned by a person who has exhibited the level of violence displayed by Caldwell is alarming. *Id.* at 6.

At the continued detention hearing on March 4, 2021, the Defendant's father testified on behalf of his son. When asked about the Defendant's arrest in Dennison, Texas for driving while intoxicated and resisting arrest in which he physically resisted officers, the Defendant had to be restrained to have blood drawn at the hospital and broke the hospital bed. *Id.* Despite being confronted with this information, Caldwell's father felt the Defendant would respect him and follow instructions.

Judge Johnson found that neither custodian was appropriate as placement for the Defendant as Ms. Caldwell may not truthfully contact the Court if the Defendant violated conditions of his release and that Mr. Caldwell (Defendant's father) being unaware of the Defendant's previous acts of violence will result in his being unable to enforce conditions of release and similarly, casts doubts on whether he would truthfully contact the Court if the Defendant violated conditions of his release. Order of Det. 7, ECF No. 11.

For all of these reasons, the government concurs with Magistrate Judge Johnson that no

condition or combination of conditions that would reasonably assure the appearance of the defendant as required and the safety of the community.

*(4) Nature and Seriousness of the Danger to Community*:

The defendant's words and actions evince a serious threat to the community. Per *Chrestman*, grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. 21-mj-218, at *13. On several occasions, Caldwell sprays without regards for several seconds in the directions of several Officers, without any regarding for their well-being or purposes in stopping rioters from advancing on the Capitol.  As was demonstrated in other instances of spraying seriously injuring Officers, Caldwell put these Officers in severe risk of harm with his spray. *See Chrestman*, at *30 ("Nearly as significant is defendant's use of force to advance towards the Capitol and his use of words to lead and guide the mob in obstructing the police and pushing against police barriers"). He also cursed at and pulled his middle finger out at the Officers, which displays the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

Caldwell then displayed no remorse for his actions, touting the fact that he shouted back at the officers that if they sprayed him, he would spray them back. All of the release conditions available to the Court depend-at least in part-on voluntary compliance. Accordingly, the potential danger Caldwell poses to the community strongly supports a finding that no conditions of release would protect the community.

## <u>CONCLUSION</u>

Pretrial detention is necessary in this case to ensure the safety of people and the community, and the appearance of the defendant as required. Pursuant, to 18 U.S.C. § 3142(e), there is clear and convincing evidence that the defendant would pose a danger to the community if released, and that there are no release conditions or combination of conditions that would ensure the safety of the community and has already been determined by a prior Magistrate Judge.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


*/s/ Puja Bhatia*
PUJA BHATIA
D.C. Bar 1009466
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

**UNITED STATES OF AMERICA,**
**Plaintiff,**

**vs.**

**CASE NO: 4:21-MJ-107-KPJ**

**DANIEL RAY CALDWELL,**
**Defendant.**

## ORDER OF DETENTION PENDING TRIAL

### Part I – Eligibility for Detention

Upon the

☒ Motion of the Government pursuant to 18 U.S.C. § 3142(f)(1), or

☐ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted. This Order sets forth the Court's finding of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II – Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** (*previous violator*): There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

   ☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

      ☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; or

      ☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; or

      ☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); or

      ☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

1

☐ **(e)** any felony that is not otherwise a crime of violence but involves: (i) a minor victim; (ii) the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); (iii) any other dangerous weapon; or (iv) a failure to register under 18 U.S.C. § 2250; **and**

☐ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; and

☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; **and**

☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

☒ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** (*narcotics, firearm, other offenses*): There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

☐ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

☒ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

☐ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**:

☐ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☒ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

☒ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis.

OR

☐ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

### Part III – Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven by:

☒ clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☐ a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

On February 9, 2021, the Government filed a Criminal Complaint, which alleged Defendant violated the following federal statutes:

- 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder);
- 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers or Employees);
- 18 U.S.C. § 1752(a)(1), (2), (4) (Knowingly Entering or Remaining in Any Restricted Building or Grounds Without Lawful Authority); and
- 40 U.S.C. § 5104(e)(2)(D), (F) (Violent Entry and Disorderly Conduct on Capital Grounds.

On March 3, 2021, a Federal Grand Jury returned an Indictment, which charged Defendant with the following violations:

- Count 1: 18 U.S.C. § 231(a)(3) (Civil Disorder);
- Count 2: 18 U.S.C. §§ 111(a)(1), (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon);
- Count 3: 18 U.S.C. §§ 1752(a)(1), (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon);
- Count 4: 18 U.S.C. §§ 1752(a)(2), (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) and
- Count 5: 18 U.S.C. §§ 1752(a)(4), (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon).

The United States moved to detain Defendant pending trial.

The Court held a detention hearing on February 22, 2021, which continued March 4, 2021. Assistant United States Attorneys Tracey M. Batson and William Richardson Tatum represented the Government, and John Hunter Smith represented Defendant. The Court heard testimony from three witnesses: Special Agent Seth D. Webb ("Agent Webb"), Ms. Kambria Caldwell ("Ms. Caldwell"), and Mr. James Caldwell ("Mr. Caldwell").

### AGENT WEBB

Agent Webb of the Federal Bureau of Investigation ("FBI") testified regarding the details of the alleged offenses and investigation leading to Defendant's arrest. Agent Webb stated that on January 6, 2021, around 1:00 p.m. Eastern Time, the United States Congress met in Washington, D.C, at the Capitol to certify the electoral college vote for the 2020 presidential election. The Capitol was closed to the public that day, with temporary barricades in place and the doors secured. However, a large group of individuals pushed back the barricades, stormed the Capitol, and delayed the election's certification.

On January 27, 2020, Twitter user @chris_sigurdson posted links to two videos. The first link directed to a YouTube video titled "Storm The Capitol w/ dream floral." The second linked directed to a video created by ProPublica, an investigative journalism news outlet.

The YouTube video depicts a large group storming the Capitol. Approximately three minutes and fifteen seconds in, a male wearing dark-tinted eyewear is depicted. The male then sprays an orange mist towards a police barricade line, and the person filming the video can be heard coughing and gasping for breath.

3

The ProPublica video depicts a male speaking with two females, with the male onscreen and the females offscreen. In the video, the male is wearing a camouflage hat, camouflage trousers, an olive-colored hoodie, a camouflage backpack, and a sticker above his left breast stating, "Guns SAVE lives." The male also has darkly tinted eyewear on his hat. Agent Webb testified the male's eyewear was specialized gear, rather than ordinary sunglasses. According to Agent Webb, the eyewear was designed to create a sealed, protective barrier, thereby preventing debris, projectiles, and mist from harming the eye.

In the ProPublica video, the male states that after ten minutes of storming the Capitol, a large fight ensued, resulting in a female being injured in the neck and transported to receive medical care. The male further states the Capitol police officers sprayed the group with mist repellant, which prompted the male say, "Dude, do it again, and I'll spray you back." The male then admits to spraying approximately fifteen police officers in response. Notably, in the YouTube video, Capitol police officers cannot be seen spraying rioters with any mist repellant.

In the ProPublica video, the male further claims the Capitol police officers shot him with "a cannon rubber bullets." Overall, the male's tone of voice was nonchalant. The two offscreen women thanked the male for his actions and stated they "were very proud of him," to which the male briefly smiled. At one point, the male reached down to his leg, revealing a black-and-white patch with what Agent Webb describes as a "unique logo."

A confidential informant claimed Defendant was depicted in both videos and provided Defendant's phone number. Using Defendant's phone number, Agent Webb then obtained Defendant's geolocation data, which revealed Defendant traveled from Texas to Washington, D.C., in the days leading up to the Capitol riots. Agent Webb testified the data showed Defendant was in the D.C. metropolitan area on January 6, 2021, and the data specifically pinpointed Defendant was at the Capitol at the time of the riots.

In his examination of the ProPublica video, Agent Webb noticed a stylized "R," which he later identified as the logo of The Renaissance Hotel in Arlington, Virginia. Agent Webb then obtained the hotel's business records, which showed Defendant was a guest at the hotel the day before the Capitol riots.

Agent Webb also testified that three sources confirmed Defendant was depicted in the ProPublica video. First, a witness ("Witness 1") stated he knew Defendant personally, as Witness 1 and Defendant frequently participated in Airsoft Military Simulation ("MilSim") events together. MilSim is a live-action, in-person simulation of armed conflict scenarios involving plastic projectiles. When Agent Webb showed Witness 1 a picture of Defendant's driver's license, with Defendant's name obscured, and the ProPublica video, Witness 1 confirmed both the driver's license and the ProPublica video depicted Defendant. Second, Defendant's ex-wife confirmed Defendant was depicted in the ProPublica video. Third, Agent Webb used facial recognition technology to determine whether a picture of Defendant's face matched with any video on the Internet. The software independently found a match between the sample picture of Defendant and the ProPublica video.

Witness 1 also told Agent Webb that Defendant was "a huge white supremacist" and "a complete whacko." According to Witness 1, when Witness 1 brought an African American teenager to MilSim events, Defendant would ask Witness 1 "why he always brings these f****** n******." On cross-examination, Agent Webb admitted he did not corroborate Witness 1's allegations.

Additionally, Witness 1 informed Agent Webb that, on multiple occasions, Defendant would bring real firearms to MilSim events. According to Witness 1, the organization admonished Defendant multiple times, directing Defendant to return the firearms to his vehicle.

Through his investigation, Agent Webb learned Defendant worked at Texas Instruments ("TI") at that time (Defendant was terminated from TI as a result of the conduct on which the underlying charges are based).

Agent Webb obtained Defendant's work schedule, and on February 10, 2021, the FBI arrested Defendant at TI. In a search incident to an arrest, agents seized the olive-green hoodie depicted in the ProPublica video. Agents also seized the black-and-white patch and the camouflage outerwear, though the FBI did not locate any mist repellant during this incident. At the time of the arrest, Ms. Kambria Caldwell ("Ms. Caldwell"), defendant's ex-wife and current co-habitant, was present. Agent Webb testified an agent asked Ms. Caldwell about Defendant's criminal history, and Ms. Caldwell stated he had none. An agent informed Ms. Caldwell that a search warrant would be executed at Defendant's residence, and the agent asked Ms. Caldwell whether there was anything dangerous of which agents should be aware. Ms. Caldwell answered in the affirmative, stating Defendant's residence contained thirteen (13) firearms locked in a safe.

### MS. CALDWELL

Defendant called Ms. Caldwell to testify as a potential third-party custodian. Ms. Caldwell stated she has known Defendant for twenty-seven years. They were married for fourteen years, separated, reconciled, and became co-habitants in 2015. Together, Ms. Caldwell and Defendant have three children: a daughter who is twenty-five years of age, a daughter who is nineteen years of age, and a son who is fifteen years of age.

Ms. Caldwell testified Defendant's pretrial detention had been difficult for their son, as Defendant and the son are "very close," and they often attend MilSim events together. She further testified that Defendant possibly suffers from a post-traumatic brain injury. Because of Defendant's arrest, he missed an appointment for an assessment with Veterans Affairs. Ms. Caldwell stated she understood the responsibilities and duties of serving as a third-party custodian, and she was willing to enforce them should Defendant be released on conditions.

On cross-examination, the Government asked Ms. Caldwell about the pretrial services report. According to the report, Defendant has been estranged from his mother and two brothers. When asked about the details of the estrangement, Ms. Caldwell was vague, stating they have been estranged "for several years" and she did not know the cause of the estrangement. When asked to give an estimated number of years, Ms. Caldwell could not provide an answer.

Ms. Caldwell further testified she was shocked when she heard Agent Webb state Defendant was a white supremacist, as Defendant has Hispanic and African American friends from his days at TI. The Government then asked whether African American friends had ever come over to Defendant and Ms. Caldwell's residence. Ms. Caldwell responded, "No." The Government asked Ms. Caldwell to name one African American friend of Defendant. After a lengthy pause, Ms. Caldwell named "Shauntessa." After another pause, Ms. Caldwell stated Shauntessa's surname was "Russell." The Government then asked for the name of another African American friend, to which Ms. Caldwell stated "Larry Tidwell" and "Sammy Edwards." Ms. Caldwell testified she and Defendant have known Larry Tidwell for twenty-four years, as Larry Tidwell worked with Defendant at TI. She then testified Defendant was one of Sammy Edwards' closest friends, as they often went to airsoft events together.

The Government then queried Ms. Caldwell whether she has ever heard Defendant make any racially charged comments. Ms. Caldwell, after another long pause, stated "No." The Government reminded Ms. Caldwell she was under oath, and re-asked the question. Ms. Caldwell answered "No."

Ms. Caldwell denied ever telling an FBI agent Defendant lacked a criminal history, thereby contradicting Agent Webb's testimony. Ms. Caldwell testified, "I would have been truthful" if asked about Defendant's criminal history, and she did not recall the FBI ever asking that question. Ms. Caldwell testified she knew Defendant had a few DUI's, and she had an altercation with Defendant resulting in police intervention. When asked about the altercation, Ms. Caldwell testified, "Well, we had been going through a lot of things—issues— so it was all coming to a point where we were both very heated. So, it just escalated, and it was—so, I had to

call 911 and there was a 911 interference and so by the time they came, they were going to arrest both of us. But they arrested [Defendant] for 911 interference." The Government then read the police report's contents, which explicated that, on February 25, 2008, Defendant became very violent, slammed Ms. Caldwell on a table, straddled her, picked her up, sat her back down, and picked her up again. The police report states Ms. Caldwell attempted to call 911, but Defendant "yanked" the phone out of the wall. Ms. Caldwell's oldest daughter then had to call 911 on her cell phone. Ms. Caldwell admitted that after this incident, she sought a restraining order against Defendant and initiated divorce proceedings.

Ms. Caldwell then testified to knowing Defendant planned on being in Washington, D.C., on January 6, 2021, though she did not know he intended to storm the Capitol. She stated she wanted to go with Defendant, but due to back surgery, Ms. Caldwell was unable to travel. Ms. Caldwell also testified Defendant asked his father to travel to the Capitol, but Defendant's father ultimately did not go. Ms. Caldwell stated that, when Defendant returned home, he told Ms. Caldwell things got out of hand and he got hit by a rubber bullet. However, before that happened, Defendant stated he met some really nice people, and walked with one from the hotel to the Capitol.

Ms. Caldwell testified that she and Defendant own nineteen (19) firearms, two (2) of which belong to Ms. Caldwell. She stated the firearms are no longer at her residence, and they are now with Ms. Caldwell's oldest daughter.

**MR. CALDWELL**

Defendant also called Mr. Caldwell, Defendant's father, to testify as a potential third-party custodian. Mr. Caldwell testified that he is sixty-eight years of age and lives in Eustace, Texas, with his wife and daughter. Mr. Caldwell's current wife is not Defendant's biological mother. According to the pretrial services report, the whereabouts of Defendant's biological mother are currently unknown. Mr. Caldwell testified he speaks to his son on the phone almost daily.

Mr. Caldwell further testified he was aware of the allegations against his son, and stated his residence contains no firearms, ammunition, explosives, or alcohol. Mr. Caldwell stated his retirement status would allow him to monitor his son, should Mr. Caldwell serve as a third-party custodian.

Mr. Caldwell testified he was not aware of an arrest occurring in Dennison, Texas. The Government explained that on October 24, 2013, Defendant was arrested for driving while intoxicated. Because Defendant physically resisted the police officers, the officers added a count for resisting arrest. At the hospital, Defendant was so physically aggressive that the hospital staff had to restrain him to draw blood. After being restrained, Defendant was able to break the hospital bed. When Defendant was later in jail, he was so physically aggressive that the jail officers tased him. Mr. Caldwell testified he did not know about this incident, and he did not know the extent of his son's actions. Mr. Caldwell stated he felt Defendant would respect him and follow his instructions.

When asked about Defendant's estrangement from his biological mother and brothers, Mr. Caldwell testified he did not know how to explain it. Mr. Caldwell stated Defendant owes his brothers several thousands of dollars. As to Defendant's biological mother, Mr. Caldwell testified, "You can't get the truth from her." Mr. Caldwell stated she "does medication" and "there's trouble there."

**CONCLUSION**

While the Court acknowledges Ms. Caldwell earnestly wishes for Defendant to be released and carry out his role as a father to their children, the Court does not find Ms. Caldwell to be a suitable third-party custodian. Throughout her testimony, Ms. Caldwell readily and quickly answered questions from Defendant's counsel, but slowly and vaguely answered questions from the Government and the Court. Ms. Caldwell's hesitancy and selective manner of answering casts doubt on the credibility of her testimony. Combined with the February 25, 2008 incident, the Court is not confident that Ms. Caldwell will be able to enforce the conditions of release were Defendant placed under her custody. Because of her testimony, the Court is not confident Ms. Caldwell will promptly and truthfully contact the Court if Defendant violated a condition of release.

With respect to Mr. Caldwell, the Court also appreciates his willingness to assist the Court and help his son. Nevertheless, the Court does not find Mr. Caldwell to be a suitable third-party custodian. Mr. Caldwell testified that he was unaware of previous incidents of violence engaged in by Defendant and, specifically, was unaware of the alleged acts of violence charged against Defendant in the Indictment. Accordingly, the Court is neither confident that Mr. Caldwell will be able to enforce the conditions of release, nor is it confident that Mr. Caldwell will promptly and truthfully contact the Court if Defendant violated a condition of release.

Because the Court cannot currently fashion any condition or combination of conditions that will reasonably assure the safety of any other person and the community as required in these proceedings, the United States' Motion for detention is **GRANTED**, and Defendant is detained pending his sentencing hearing.

In addition to any findings above or other findings made on the record at the hearing, the reasons for detention include the following:

☒ Weight of evidence against the defendant is strong

☒ Subject to lengthy period of incarceration if convicted

☒ Prior criminal history

☐ Participation in criminal activity while on probation, parole, or supervision

☒ History of violence or use of weapons

☒ History of alcohol or substance abuse

☒ Lack of stable employment

☐ Lack of stable residence

☐ Lack of financially responsible sureties

☒ Lack of significant community or family ties to the charging district

☐ Significant family or other ties outside the United States

☐ Lack of legal status in the United States

☐   Subject to removal or deportation after serving any period of incarceration

☐   Prior failure to appear in court as ordered

☐   Prior attempt(s) to evade law enforcement

☐   Use of alias(es) or false documents

☐   Background information unknown or unverified

☐   Prior violations of probation, parole, or supervised release

## Part III - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**So ORDERED and SIGNED this 5th day of March, 2021.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE