# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-00181-CKK** |
| | : | |
| **DANIEL RAY CALDWELL** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## OPPOSITION TO DEFENDANT'S MOTION FOR PRE-TRIAL RELEASE [ECF No. 21]

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant, Daniel Ray Caldwell, being released from pre-trial detention. ECF No. 21. The defendant should be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) [Crime of Violence]. Moreover, the defendant should be detained pending trial pursuant to 18 U.S.C. §§ 3142(e) and (f)(2). The Court should order the defendant detained because there are no conditions or combination of conditions which will reasonably assure the appearance of the defendant as required and ensure the safety of any other person and the community.

The government respectfully requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

## BACKGROUND

1.    **Procedural Posture**

The defendant was arrested in Texas on February 10, 2021. He appeared before Magistrate Judge Kimberly C. Priest Johnson in a detention hearing on February 22, 2021 and continued to March 4, 2021. Judge Johnson issued an order of detention pending trial and a commitment to

another district while the defendant was remanded to the custody of the U.S. Marshals for transport

to the District of Columbia.

On March 3, 2021, an indictment was returned with respect to Caldwell, charging him with

following seven counts:

1. Obstruction of Law Enforcement During Civil Disorder (18 U.S.C. § 231(a)(3)) (5 year max);
2. Inflicting Bodily Injury on Certain Officers (18 U.S.C. § 111(a)(1), and (b)) (20 year max);
3. Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(1), (b)(1)(A)) (10 year max);
4. Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(2), (b)(1)(A)) (10 year max);
5. Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(4), (b)(1)(A)) (10 year max);
6. Violent Entry and Disorderly Conduct on Capitol Grounds (40 U.S.C. § 5104(e)(2)) (6 month max)
7. Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F)) (6 month max).

## FACTUAL BACKGROUND

**1. The Attack on the United States Capitol on January 6, 2021**

The defendant, Daniel Ray Caldwell, has been indicted on seven counts, as detailed further

below, arising from his participation in a riot that occurred at the United States Capitol Building,

located at 1 First Street, NW, Washington, D.C. on January 6, 2021.

The government hereby proffers that, two months after the November 3, 2020 presidential

election, on January 6, 2021, a joint session of the United States Congress convened at the Capitol

to certify the vote count of the Electoral College of the 2020 Presidential Election. The joint session

began at approximately 1:00 p.m., with then–Vice President Mike Pence presiding. By 1:30 p.m.,

the United States House of Representatives and the United States Senate adjourned to separate

chambers within the Capitol to resolve an objection raised in the joint session. Vice President

Pence continued to preside in the Senate chamber.

As the House and Senate proceedings took place, a large crowd of protestors gathered outside the Capitol. "[T]emporary and permanent barricades were in place around the exterior of the . . . building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside." Shortly after 2:00 p.m., a violent mob of rioters "forced entry" into the Capitol, and mayhem broke out inside the building, putting an hours-long halt to the electoral vote count while elected representatives, congressional staff, and members of the press hid from the mob. The joint session, and thus the constitutional ritual of confirming the results of the 2020 Presidential Election, "was effectively suspended until shortly after 8:00 p.m."

## 2. Daniel Caldwell's Criminal Conduct

At approximately 1:00 p.m., a crowd of violent rioters had broken through previously barricaded areas and assembled on the Lower West Terrace, which was off limits to the public at that time. USCP had formed a line of bike racks extending from the North end of the Lower West Terrace to the South end, to act as a barrier against the crowd. Officers were standing watch behind this line and fending off repeated attempts by the rioters to pull on the bike racks, either with their hands or with ropes and straps, and move forward toward the Capitol.

The surveillance footage of this incident shows Caldwell confronting and taunting law-enforcement.   At approximately 2:05 p.m., Caldwell can be seen walking up the steps towards a group of law-enforcement officers forming a human shield to protect the U.S. Capitol at the Lower West Terrace.  *See* Figure One.



*Figure One*

Caldwell is captured on video from multiple angles and multiple sources.  See Body Worn Camera

screen capture from Officer Rodriguez, Figure Two.



*Figure Two*

4

*See* also, BWC video from Officer Chance, Figure Three.



*Figure Three*

Caldwell was also captured on video by in independent YouTube vlogger, and uploaded to YouTube under the title "Storm The Capital w/ dream floral."  *See* Figure Four.



*Figure Four*

After receiving tips, including two Youtube videos posted by @chris_sigurdson titled, "Storm The Capitol w/ dream floral", viewing United Stated Capitol Police video, bodyworn

camera footage and a ProPublica video where Caldwell gives an interview recalling his actions at the Capitol, the FBI was able to identify Caldwell.

Video obtained from United Stated Capitol Police shows Caldwell, wearing an olive drab in color hoodie, dark glasses on a camouflage hat, camouflage assault pack, and camouflage trousers, yelling and flipping off Officers in the police line shortly before unleashing a mist of pepper spray/mace, while moving his hand from left to right in an attempt to get the entire line of officers. *See* Figures Five and Six.

 

*Figure Five*                    *Figure Six*

A different angle from a distance shows Caldwell at the front of the crowd at the point where the crowd confronts law-enforcement. *See* Figure Seven.



*Figure Seven*

During the events of the day, Caldwell is also captured on video talking to someone on a Baofeng radio.  *See* Figure Eight.



*Figure Eight*

Subsequently, in an interview at the Renaissance Hotel in Arlington, Virginia, wearing the same clothing he was seen wearing earlier, this time with a red sticker on the left breast that read "Guns SAVE Lives" sticker on his sweatshirt. Caldwell recalled that a large fight broke out and a female was hit in the neck. Caldwell said that individuals stayed in the area and police were spraying mace towards him. Caldwell then threatened the officers using spray to deploy the individuals in the area and meant to disperse the angry crowd by yelling back to them that if they continued, he would return spray. Once the officers sprayed him, Caldwell sprayed toward police officers and believed he sprayed around 15 officers. Caldwell stated that officers then shot him with a big cannon with rubber bullets. This showed a complete lack of respect for the role of law enforcement, in which officers were attempting to stymie further chaos on the scene and Caldwell responded with further violence and anger.  *See* Figures Nine and Ten.

 

*Figure Nine*                    *Figure Ten*

After interviewing witnesses who were able to identify Caldwell, W1 described the

individual as a "huge white supremacist" and was "a complete wacko." While playing Airsoft Military Simulation (MilSim), which is a live-action, in person simulation of armed conflict scenarios conducted by civilians that involve airsoft plastic projectiles launched by replica weapons, but do not involve actual firearms, according to W1, the individual would bring a real firearm to the course and had to be corrected on multiple occasions to return the firearm to his vehicle. Another witness, W2, stated that IT felt discriminated against in the MilSim events and referred to Caldwell as being a "dickhead" to IT. Specifically, Caldwell's group would talk loudly about having real firearms in their vehicles around W2 and would shoot W2 an excessive amount of times in an attempt to intimidate W2.

Pursuant to a lawfully-obtained search warrant, law enforcement was able to recover from the defendant's premise the camouflage backpack with unique patch and a black Baofeng radio. From his vehicle, the dark tinted sunglasses were recovered, which Agent Webb testified were specialized gear to create a protective barrier from things harming the eye. Order of Detention at 4, *United States v. Caldwell*, 21-MJ-00107-KPJ (E.D. Tex. March 5, 2021), ECF No. 11. Caldwell came prepared not just with pepper spray/mace, but also with protective gear to protect his eyes, knowing full well his activities would involve him getting sprayed in returned. At the time of his arrest, he was wearing the wearing the 5.11 hoodie, which were the items Caldwell was seen wearing at the Capitol on January 6th.

## LEGAL STANDARD

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)). Thus, a

detention hearing must be held at the government's request only "in a case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B). The BRA "requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *Salerno*, 481 U.S. at 755.

The charges brought against Caldwell triggered a detention hearing under 18 U.S.C. 3142(f)(1)(A) ("crime of violence"), defined broadly as "an offense that has as an element of … physical force" or a felony that "by its nature, involves a substantial risk that physical force against the person or property of another." 18 USC § 3156(a)(4). This case also involves "a serious risk that such person will flee." 18 U.S.C. § 3142(f)(2)(A). Accordingly, the Court "shall hold a hearing to determine whether any condition or combination of conditions … will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. 3142(f). The Court held such a hearing in the Eastern District of Texas on February 22, 2021 and March 4, 2021.

Having reviewed the evidence in this case, Magistrate Judge Johnson found that pursuant to 18 U.S.C. § 3142(e)(3), there is a rebuttable presumption that no condition or conditions will reasonably assure the appearance of the defendant and the safety of the community because there is probable cause the defendant committed an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a term of imprisonment of 10 years or more is attached. Order of Det. 2, ECF No. 11. To determine whether conditions exist that will reasonably assure the appearance of the defendant as

required and the safety of any person in the community, the judicial officer shall consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(l)-(4). Magistrate Judge Johnson reviewed such factors and made the appropriate decision to detain the Defendant.  When a magistrate's detention order is reviewed by the trial court, courts in this district have held, in line with courts across the country, that such detention decisions are reviewed de novo. *See United States v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017); *see also United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662 (D.D.C. Feb. 26, 2021) at 5-6.  Caldwell does not contest that he is eligible for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), having been indicted with a crime of violence - Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b).

## **ARGUMENT**

The gravity of the conduct that occurred at the U.S. Capitol on January 6, 2021, cannot be understated. *United States v. Sabol*, No. 21-cr-35-EGS (D.D.C. April 14, 2021), Memorandum Opinion (ECF No. 56) at 27, citing *United States v. Munchel*, No. 21-3010, 2021 WL 1149196 at 4 (D.C. Cir. March 26, 2021) 27.  "This was a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *Id*., citing *United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021).  During the course of the January 6, 2021, siege of the U.S. Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals armed with baseball bats, stun guns, fireworks, and pepper spray, among other dangerous weapons.

Specific members of the mob targeted the individual officers assigned to protect the Capitol as part of a coordinated effort to breach the police lines, break through the doors of the Capitol, and achieve their goal of interfering with the certification of the Presidential election. Simply put, without the violent efforts of these specific individuals to injure and/or incapacitate law enforcement officers who were executing their duties and protecting our democracy, the barrier lines would never have been breached, and rioters would likely not have gained entry into the Capitol Building.

The defendants' conduct on January 6th must be analyzed against this backdrop. Without their premeditated actions to break down the police line and directly attack officers in concert with likeminded rioters, a breach of the Capitol could not have occurred. While the government understands that not all participants in the riot are deserving of pretrial detention, those, like the defendants, who, without provocation, directly assaulted multiple law enforcement officers with dangerous weapons certainly belong in the most serious category of culpability. *See Chrestman*, 2021 WL 765662 at 8. ("The conduct of a defendant who injured, attempted to injure, or threatened to injure others, or who damaged or attempted to damage federal property, is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises.")  The assault on uniformed law enforcement officers gives rise to "grave concerns" regarding the dangerousness of the defendants. *Id*. ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement," because such conduct demonstrates "disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community").

The court in *Chrestman* articulated six "guideposts" for assessing "the comparative

culpability of a given defendant in relation to fellow rioters." *Id*. The guideposts are as follows: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's "words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others." *Id*. at 7-8. These factors, "[t]aken together, as applied to a given defendant, . . . are probative of 'the nature and circumstances of the offense charged,' 18 U.S.C. § 3142(g)(1), and, in turn, of the danger posed by the defendant." *Sabol*, Memorandum Opinion at 28-29.

In this case, five of the six guideposts as applied to Caldwell weigh overwhelmingly towards a finding of dangerousness. The defendant is charged with felonies as opposed to misdemeanors. The defendant obtained a cannister of a chemical weapons specifically in anticipation of travelling to Washington, D.C. for the January 6 event. Caldwell used a dangerous weapon, that is, a chemical spray. There is evidence of coordination, as demonstrated by the use of a Baofeng radio during the riot. Finally, Caldwell injured or attempted to injure others by attacking multiple unsuspecting officers. An application of the *Chrestman* guideposts to the facts before this Court make it clear that Caldwell should be detained. *See Munchel*, 2021 WL 1149196 at 8 ("those who actually assaulted police officers and broke through windows, doors and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id*.). In distinguishing those cases from the *Munchel* decision, Judge

Emmet G. Sullivan recently held,

> "While the circumstances of January 6, 2021 were unique, and the day has passed, it cannot be said that every Capitol Riot defendant is no longer a danger because those exact circumstances are unlikely to arise again. The D.C. Circuit certainly did not say as much; instead, the court observed that for the defendants in that case who 'did not vandalize any property or commit violence, the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community.'"

*Sabol* at 60, quoting *Munchel* at 8.

### A.    The Court should continue to hold the Defendant pursuant to 18 U.S.C. § 3142(e)

The United States submits that there continue to be no condition or combination of conditions the Court could impose that would reasonably assure the safety of the community or the appearance of the defendant, which is in line with Magistrate Johnson's decision pursuant to 18 U.S.C. § 3142(e)(3), in which the factors under 18 U.S.C. § 3142(g)(1-4) were considered. The Court should continue to deny release pursuant to those factors.

*(1) The Nature and Circumstances of the Offense Charged*:

The defendant has been charged with grave offenses. He forcibly entered and remained on the Capitol grounds and by his actions, worked to delay and hinder Congress's certification of the Electoral College vote. He was at the front of the crowd talking to and flipping off officers, taunting them before deciding to unleash spray on a large group of officers, knowing full well the effect of prolonged spray on the officers who were trying to calm and disperse an angry crowd.

Instead of showing remorse for his actions, he touted his efforts in the ProPublica video by proudly stating he threatened the officers for spraying the crowd by returning spray back to them. As stated by Chief Judge Beryl A. Howell, "[t]he actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law." *See United States v. Chestman*, 21-mj-218

14

(BAH), ECF No. 23, at *13, 16 (D.D.C. February 26, 2021) ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification").

(2) *The Weight of Evidence Against the Person*:

Substantial evidence supports the position that Caldwell poses a threat to the community. Caldwell's violent actions at the Capitol were captured on film, through United States Capitol Police video, social media footage, and an interview given by Caldwell himself. Caldwell confirmed his presence at the Capitol and then recounted with pride the actions taken in retaliation for officers who were trying to maintain peace and trying to disperse an angry crowd that had already caused an immense amount of violence and destruction. The weight of the evidence thus strongly supports a finding that no conditions of release would protect the community.

(3) *History and Characteristics of the Person*:

The United States adopts the factual proffer related to the defendant's history and characteristics in the February 14, 2021 pretrial services report generated by Tiffany Routh, United States Probation Officer in Texas. The Defendant has a 2006 conviction for Driving While Intoxicated in Newburgh Town, New York, a 2008 conviction for Disorderly Conduct and Assault Causes Bodily Injury – Family Violence from The Colony, Texas, and a 2013 conviction for Driving While Intoxicated and Resisting Arrest in Denison, Texas.

As described in Magistrate Judge Johnson's order, several third-party custodians were presented by defense as suitable places for Caldwell to live. However, Ms. Caldwell, the Defendant' ex-wife would not provide details of the Defendant's estrangement from his mother and two brothers. Order of Det. 5, ECF No. 11. Ms. Caldwell gave hesitated answers to whether she ever heard the Defendant make racist comments. In contradiction of her interview with Agent

Webb at the time the search warrant of their premise was executed, Ms. Caldwell admitted in the detention hearing that the Defendant had previous DUIs and that the police were called due to a domestic situation in which things "escalated", according to her view. In contrast, the police detailed that the Defendant slammed Ms. Caldwell's on a table, straddled her, picked her back up, sat her back down and picked her up again. She was confronted with the fact that the she was not able to call 911 because the Defendant ripped the phone from the wall and once confronted with this information, she admitted she sought a restraining order and began divorce proceedings against the defendant. *Id.* at 5-6. She admitted that the Defendant owned nineteen firearms, two of which belong to her. Although these firearms are now at her daughter's house, the large number of firearms owned by a person who has exhibited the level of violence displayed by Caldwell is alarming. *Id.* at 6. In Defendant's Motion to Revoke or Amend Magistrate's Order of Pretrial Detention, Defendant claims that him and his ex-wife having lived together for the past five years and raised their children is evidence that he can be released to their home. Def's Mot. at 5-6. However, as the Court noted in its order, there is sufficient evidence that Ms. Caldwell would not report issues even if they did arise with the Defendant and so the mere fact that they have lived together for several years did not convince the Court, and should continue to dissuade this Court, from believing that the Defendant's release will guarantee accountability and honest reporting of issues.

At the continued detention hearing on March 4, 2021, the Defendant's father testified on behalf of his son. When asked about the Defendant's arrest in Dennison, Texas for driving while intoxicated and resisting arrest in which he physically resisted officers, the Defendant had to be restrained to have blood drawn at the hospital and broke the hospital bed. *Id.* Despite being confronted with this information, Caldwell's father felt the Defendant would respect him and

follow instructions.

Judge Johnson found that neither custodian was appropriate as placement for the Defendant as Ms. Caldwell may not truthfully contact the Court if the Defendant violated conditions of his release and that Mr. Caldwell (Defendant's father) being unaware of the Defendant's previous acts of violence will result in his being unable to enforce conditions of release and similarly, casts doubts on whether he would truthfully contact the Court if the Defendant violated conditions of his release. Order of Det. 7, ECF No. 11.

In his motion, Defendant claims that he is not a risk for nonappearance, and then cites information presented at the detention hearing in the Eastern District of Texas that he was fired from his job at Texas Instruments. Def's Mot. at 4-5.  This is precisely the kind of evidence that demonstrates his elevated risk of not appearing due to the lack of income stability and an employment tie keeping him in Texas if he were released. Moreover, the Defendant's Pretrial Services Report, prepared by Tiffany Routh, United States Probation Officer in Texas, cites that the Defendant is at risk for nonappearance due to his substance abuse history.

For all of these reasons, the government concurs with Magistrate Judge Johnson that no condition or combination of conditions that would reasonably assure the appearance of the defendant as required and the safety of the community.

*(4) Nature and Seriousness of the Danger to Community*:

The defendant's words and actions evince a serious threat to the community. Per *Chrestman*, grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. 21-mj-218, at *13. On several occasions, Caldwell sprays without regards for several seconds in

the directions of several Officers, without any regarding for their well-being or purposes in stopping rioters from advancing on the Capitol.  As was demonstrated in other instances of spraying seriously injuring Officers, Caldwell put these Officers in severe risk of harm with his spray. *See Chrestman*, at *30 ("Nearly as significant is defendant's use of force to advance towards the Capitol and his use of words to lead and guide the mob in obstructing the police and pushing against police barriers"). He also cursed at and pulled his middle finger out at the Officers, which displays the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.  Recently in an assault on a law-enforcement case, the District Court identified and articulated the threat to the community and commented that "the defendant's willingness to assault a police officer on January 6—in the full view of other officers, scores of bystanders, and many cameras—confirms that, when enraged, he poses a danger to the community."  *United States v. Scott Fairlamb*, Case No. 1:21-cr-120-RCL (D. D.C., Apr. 26, 2021) ECF No. 31, pg. 17.

Caldwell then displayed no remorse for his actions, touting the fact that he shouted back at the officers that if they sprayed him, he would spray them back. All of the release conditions available to the Court depend-at least in part-on voluntary compliance. Accordingly, the potential danger Caldwell poses to the community strongly supports a finding that no conditions of release would protect the community.

## **CONCLUSION**

Pretrial detention is necessary in this case to ensure the safety of people and the community, and the appearance of the defendant as required. Pursuant, to 18 U.S.C. § 3142(e), there is clear

and convincing evidence that the defendant would pose a danger to the community if released, and

that there are no release conditions or combination of conditions that would ensure the safety of

the community and has already been determined by a prior Magistrate Judge.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


*/s/ James D. Peterson*
JAMES D. PETERSON
VA Bar 35373
James D. Peterson
Trial Attorney
Criminal Division
United States Department of Justice
1331 F Street N.W.
6th Floor
SAUSA
U.S. Attorney's Office for the District of Columbia
Washington, D.C. 20530
(202) 353-0796
James.d.peterson@usdoj.gov