**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| DANIEL RAY CALDWELL, |
| Defendant |

Criminal Action No. 21-181 (CKK)

## MEMORANDUM OPINION
(May 21, 2021)

Defendant Daniel Ray Caldwell is charged with seven felony and misdemeanor offenses arising from his participation in the events at the United States Capitol on January 6, 2021.  After his arrest in Texas on February 10, 2021, the Government moved for Defendant Caldwell to be detained pending trial.  Magistrate Judge Kimberly C. Priest Johnson of the United States District Court for the Eastern District of Texas held a detention hearing and ordered that Defendant Caldwell be detained pending trial.

Pending before the Court is Defendant Caldwell's [21] Motion to Revoke or Amend Magistrate's Order of Pretrial Detention, in which he asks the Court to revoke the magistrate judge's detention order and place him on pretrial release with conditions.   Upon careful consideration of the pleadings,[1] the relevant legal authority, and the record before the Court, the Court shall **DENY** Defendant Caldwell's motion.

---

[1] The Court's consideration has focused on the following:
- Defendant's Motion to Revoke or Amend Magistrate's Order of Pre-Trial Detention ("Def.'s Mot."), ECF No. 21;
- Government's Opposition to Defendant's Motion for Pre-Trial Release ("Gov.'s Opp'n"), ECF No. 22; and
- Defendant's Reply to the Government's Opposition to Defendant's Motion for Pre-Trial [Release] ("Def.'s Reply"), ECF No. 23.

## I.   BACKGROUND

Defendant Caldwell is charged by Indictment with seven felony and misdemeanor counts: (1) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (2) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); (3) Entering and Remaining in a Restricted Building or Ground with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); (4) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of  18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); (5) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); (6) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (7) Act of Physical Violence in the Capitol Grounds or Building, in violation of 40 U.S.C. § 5104(e)(2)(F).  Indictment, ECF No. 5.

The facts discussed here are based upon the record presently before the Court, including the Statement of Facts in support of the Criminal Complaint, the testimony of Special Agent Seth D. Webb of the Federal Bureau of Investigation ("FBI"), Kambria Caldwell, and James Caldwell during Defendant Caldwell's detention hearing before the magistrate judge, and the evidence proffered by the Government.  In an exercise of its discretion, the Court declines to hear additional evidence. *See United States v. Sheffield*, 799 F. Supp. 2d 18, 29 (D.D.C. 2011) ("The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons." (internal citations and quotation marks omitted)). The facts stated here do not represent the Court's findings of fact on the merits of the case, which are the province of the jury.

**A.  Factual Background**

On January 6, 2021, a joint session of the United States Congress convened to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020.  *See* Compl., Stmt. of Facts ("SOF") at 1, ECF No. 1-1.  The joint session began at approximately 1:00 p.m., with then-Vice President Michael R. Pence presiding.  *Id.*  By 1:30 p.m., the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to resolve an objection raised in the joint session.  *Id.*  Vice President Pence continued to preside in the Senate chamber.  *Id.*  As the House and Senate proceedings took place, a large crowd of protesters gathered outside the Capitol.  *Id.*  "[T]emporary and permanent barricades were in place around the exterior of the . . . building, and United States Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside."  *Id.*

Shortly after 2:00 p.m., "individuals in the crowd forced entry into the Capitol building, including by breaking windows and by assaulting members of the Capitol Police, as others in the crowd encouraged and assisted those acts."  *Id.*  These violent acts caused members of the Senate and House of Representatives to evacuate the chambers of the Capitol and suspend the certification process of the presidential election results.  *Id.*

Defendant Caldwell drove from The Colony, Texas to Washington, D.C. to "protest" Congress's certification of the presidential election results.  *See* Def.'s Reply at 3.  Videos from the Capitol Police, including body-worn camera videos, and from an "independent YouTube vlogger" show Defendant Caldwell on the lower west terrace outside of the Capitol at approximately 2:05 p.m., walking up the steps towards a group of law enforcement officers forming a "human shield."  Gov.'s Opp'n at 3–5.  Caldwell was wearing an "olive drab in color

hoodie, dark glasses . . . , a camouflage hat, camouflage assault pack, and camouflage trousers." *Id.* at 3.  According to Agent Webb, the dark glasses were "military-style issued eye pro or eye protection" glasses, which "wrap around the eye" and "protect the eye from liquids or objects from getting poked in the eye[.]"  Def.'s Mot. Ex. A, Hr'g. Tr. (Feb. 22, 2021) at 13:15–23, 40:16–22, ECF No. 21-1.

The videos capture Defendant Caldwell spraying an orange-yellow chemical spray at the line of police officers, some of whom were equipped with riot shields.  The chemical spray is thick enough to be visible in surveillance videos:



Gov.'s Opp'n at 4, Figure 1; *see also id.* at 3–4, Figures 2–4.  Additional videos show Defendant Caldwell at the front of a crowd confronting police officers, "flipping off" police officers, and spraying "a mist of pepper spray/mace while moving his hand from left to right in an attempt to get the entire line of officers." Gov.'s Opp'n at 6–7, Figures 5–7.  Defendant Caldwell was also captured on video using a Baofeng radio:



Gov.'s Opp'n at 7, Figure 8.

In a later video, recorded at 4:54 pm on January 6, 2021 and uploaded to ProPublica, Defendant Caldwell spoke to off-camera interviewers about his participation in the events at the Capitol. *Id.* at 8; *see also* SOF at 3–4. Defendant Caldwell was wearing the same hoodie, backpack, dark-tinted glasses, and camouflage-print cap as in the videos of him at the Capitol, with the addition of a red sticker that reads "Guns SAVE Lives." Gov.'s Opp'n at 8. The video was recorded at the Renaissance Hotel in Arlington, Virginia. *Id.* Records obtained from that hotel indicate that Defendant Caldwell stayed there on January 5, 2021. SOF at 4.

Defendant Caldwell stated in the ProPublica video that ten minutes after "storming the Capitol," a large fight broke out and a female was "hit in the neck." *Id.* Caldwell then said that police began spraying mace towards the crowd, and Caldwell told the police that if they continued, he would return spray. *Id.* He stated that he then sprayed toward the police officers, and believed that he sprayed about fifteen of them. *Id.* Agent Webb testified that he believed Defendant Caldwell's statements in the ProPublica video indicate that he was inside the Capitol building on January 6, 2021, as he appeared to describe a fight that broke out inside the Capitol building, during which a woman was shot by a police officer while she and others were attempting to breach a

barricaded door.  *See* Hr.'g Tr. (Feb. 22, 2021) at 12:20–13:4 ("In the ProPublica video, he stated after we started storming, a huge fight -- a large fight broke out and  female was hit in the neck, which I believe to be Ashli Babbitt, who was shot inside the Capitol.").  Agent Webb stated, however, that at the time of the detention hearing, the FBI had not identified video of Defendant Caldwell inside the Capitol building.  *Id.* at 22:4–15.  The Government's opposition to Defendant Caldwell's motion does not include video or photographs of Defendant Caldwell inside the Capitol building.  Agent Webb also testified that based on his review of the video uploaded to ProPublica, it did not appear that Defendant Caldwell was remorseful for his actions on January 6, 2021.  *Id.* at 15:17–24.

Agent Webb testified during the detention hearing that he had identified Defendant Caldwell from a "black and colored patch with white bordering, which was later identified to be an American Military Simulation patch."  *Id.* at 7:19–24.  According to Agent Webb, American Military Simulation sponsors "Airsoft events" during which individuals shoot plastic projectiles at each other in military-style competition.  *Id.* at 7:25–8:2.  A confidential informant ("Witness 1") identified that specific patch, and also indicated that he recognized Defendant Caldwell based on screenshots from the January 6, 2021 videos and from being shown Defendant Caldwell's driver's license photo.  *Id.* at 9:7–23.  Witness 1 said that he had seen Defendant Caldwell at Military Simulation events, but did not know his name.  *Id.* at 25:23–26:16.  Agent Webb testified that Witness 1 had described Defendant Caldwell as "a complete wacko" and believed him to be a "white supremacist."  *Id.* at 10:5–8.  Agent Webb later stated that this information was purely the "speculation" of Witness 1, and that he had not corroborated these claims.  *Id.* at 27:15–28:2.  Witness 1 also told Agent Webb that Defendant Caldwell came to Military Simulations with real

firearms, and had been admonished several times to return the "actual firearm" to his vehicle. *Id.* at 10:18–25.

Defendant Caldwell was arrested on a warrant pursuant to a criminal complaint on February 10, 2021. *See* Rule 5(c) Documents at 7, ECF No. 8. In a search incident to arrest, the FBI seized an "olive drab in color hoodie." Hr'g Tr. (Feb. 22, 2021) at 11:21–23. The FBI also executed a search warrant of Defendant Caldwell's residence, during which the FBI seized an "assault pack," as well as "several trousers and baseball hats with the multi cam, camouflage pattern," items which were "consistent" with the clothing Defendant Caldwell was wearing in the videos from January 6, 2021. *Id.* at 11:24–12:4, 13:11–14. A black Baofeng radio was also seized from Defendant Caldwell's residence. Gov.'s Opp'n at 9. Dark-tinted sunglass were recovered from Defendant Caldwell's vehicle. *Id.*

After Defendant Caldwell was arrested, he indicated to the FBI that he had "12 to 13 firearms locked in a safe in his residence," as well as "multiple Airsoft weapons" throughout the residence. Hr'g Tr. (Feb. 22, 2021) at 14:4–13.

Defendant Caldwell's ex-wife and current co-habitant, Ms. Kambria Caldwell, was present during the execution of the search warrant. *Id.* at 12:5–13. She was shown a screenshot from the ProPublica video and confirmed that the individual in the video was Defendant Caldwell. *Id.* at 12:12–23. She also told FBI agents that she knew Defendant Caldwell had driven to Washington, D.C. *Id.* at 12:5–8, 16:3–8.

## B.  Procedural Background

The Government moved to detain Caldwell pending trial pursuant to 18 U.S.C. § 3142(f)(1). *See* Order of Detention Pending Trial ("Det. Order") at 1, 3, ECF No. 8. A detention hearing before Magistrate Judge Kimberly C. Priest Johnson of the U.S. District Court for the

Eastern District of Texas was held on February 22 and March 4, 2021.  *Id.*  On March 3, 2021, a grand jury returned an Indictment charging Defendant Caldwell with the seven counts listed above.

During the detention hearing, Agent Webb testified regarding the investigation of Defendant Caldwell.  *See supra* Section I(A).  He was also asked if he believed Defendant Caldwell would be a danger to the community if released pending trial.  He responded that he did believe Defendant Caldwell would be a danger to the community, citing the defendant's criminal history and the fact that Defendant Caldwell brought an "unidentified propellant" to the United States Capitol and used it against law enforcement officers.  Hr'g Tr. (Feb. 22, 2021) at 18:11–19:8. Agent Webb also testified that he believed that if Defendant Caldwell was released, he would not appear in court in the District of Columbia, due to financial limitations and his lack of ties to this jurisdiction.  *Id.* at 19:11–24.  He testified that Defendant Caldwell does not have a passport and was most recently out of the country twelve years ago.  *Id.* at 33:19–25.  Defendant Caldwell was fired from his job at Texas Instruments as a result of his arrest in this case.  *Id.* at 49:25–50:2.

Ms. Kambria Caldwell testified during the detention hearing as a potential third-party custodian.  She and Defendant Caldwell were married for fourteen years and then divorced.  *Id.* at 47:3–7.  Although still divorced, they have lived together since approximately 2015 or 2016 and have three children together, including two adult children and a son in high school.  *Id.* at 47:8–25.  Ms. Caldwell testified that she believes Defendant Caldwell would follow any conditions of release and that she would contact the Court immediately if he did not follow any conditions of release.  *Id.* at 51:8–19.  Ms. Caldwell also represented that the firearms that had previously been stored in their house had been removed.  *Id.* at 51:20–52:1.

During cross-examination, Ms. Caldwell was asked if she had ever heard her husband use "racial comments."  *Id.* at 54:2–9.  She stated that she had not.  *Id.*  Magistrate Judge Johnson

8

noted that Ms. Caldwell took a long pause before responding to that question, was reminded by the Government that she was under oath, and then was re-asked the question, to which Ms. Caldwell answered "no." Det. Order at 5; *see* Hr'g Tr. (Feb. 22, 2021) at 54:2–9.

The Government also asked Ms. Caldwell about a domestic altercation between her and Defendant Caldwell in February 2008. Ms. Caldwell testified, "Well, we had been going through a lot of things—issues—so it was all coming to a point where we were both very heated. So, it just escalated, and it was—so, I had to call 911 and there was a 911 interference and so by the time they came, they were going to arrest both of us. But they arrested [Defendant Caldwell] for 911 interference." *Id.* at 57:14–24. The Government then "read the police report's comments" from that incident, Det. Order at 6, which indicated that Defendant Caldwell "became very violent," "slammed" Ms. Caldwell on a table, and "straddled [her] so [she] couldn't move." *Id.* at 60:2–8. He "yanked the phone out of the wall" when she tried to call 911. *Id.* at 60:9–14. Following this incident, Ms. Caldwell sought a protective order and filed for divorce. *Id.* at 59:24–60:1, 66:6–12; *see also* Det. Order at 6. Defendant Caldwell was charged with disorderly conduct (a misdemeanor) and assault causing bodily injury – family violence, but was not convicted of the assault offense. *See* Def.'s Mot. at 5.

Magistrate Judge Johnson observed that Ms. Caldwell answered questions by defense counsel "readily and quickly," but "slowly and vaguely answered from the Government." Det. Order at 7. The court concluded that Ms. Caldwell's "hesitancy and selective manner of answering casts doubt on the credibility of her testimony." *Id.*

Defendant Caldwell's father, Mr. James Caldwell, also testified as a potential third-party custodian. *See* Def.'s Mot. Ex. B, Hr'g Tr. (Mar. 4, 2021), ECF No. 21-2. Mr. Caldwell testified that he is retired and lives with his wife and daughter. *Id.* at 4:24–25, 5:11–12. He stated that he

did not have any firearms or ammunition, or any alcohol in his home.  *Id.* at 6:19–7:3.  Mr. Caldwell testified that he believed his son, if released, would comply with all terms and conditions, and that Mr. Caldwell would report to the Court if he did not.  *Id.* at 7:4–11.  Mr. Caldwell was also asked about the circumstances of Defendant Caldwell's arrest for driving while intoxicated in October 2013 in Denison, Texas.  *See id.* at 7:9–19, 13:9–13; *see also* Def.'s Mot. at 5.  According to the Government, Defendant Caldwell had to be restrained when law enforcement tried to serve a warrant for a blood draw because he "fought so much at the hospital, that he broke the hospital bed."  Hr'g Tr. (Mar. 4, 2021) at 7:9–19, 9:17–19.  Mr. Caldwell testified that he was unaware of specific circumstances of this incident.  *Id.* at 9:7–19.

Magistrate Judge Johnson concluded that neither Ms. Caldwell nor Mr. Caldwell would be a suitable third-party custodian, noting a lack of confidence that either family member would promptly and truthfully contact the court if Defendant Caldwell violated a condition of his release. Det. Order at 7.  The magistrate judge noted the following reasons for ordering Defendant Caldwell to be detained pending trial: weight of evidence against the defendant is strong; subject to lengthy period of incarceration if convicted; prior criminal history; history of violence or use of weapons; history of alcohol or substance abuse; lack of stable employment; lack of significant community or family ties to the charging district.  *Id.*  Based on these reasons, Magistrate Judge Johnson concluded that the Government had proven by "clear and convincing evidence" that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community and ordered Defendant Caldwell detained pending trial.  *Id.* at 2–3.

## II.    LEGAL STANDARD

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "the court having original jurisdiction over the offense."   18 U.S.C. § 3145(b).   Although the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to *de novo* review.  *See United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases supporting this proposition from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits).  The district court is "free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons."  *Sheffield*, 799 F. Supp. 2d at 20 (quoting *United States v. Hanson*, 613 F. Supp. 2d 85, 88 (D.D.C. 2009)).   The parties here agree that *de novo* review is appropriate. *See* Def.'s Mot. at 3; Gov's Opp'n at 11.

The Bail Reform Act permits pretrial detention in only "carefully defined circumstances." *United States v. Simpkins*, 826 F.2d 94, 95–96 (D.C. Cir. 1987).  A detention hearing must be held only if a case involves any of an enumerated set of offenses, including a crime of violence or a felony that involves the use of a dangerous weapon, § 3142(f)(1), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B).

The question for the Court is whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).  In determining whether a defendant should be detained pending

trial, the Court must consider "the available information" concerning four enumerated factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. § 3142(g).

"To justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *United States v. Munchel*, 991 F.3d 1273, 1279–80 (D.C. Cir. 2021) (quoting § 3142(f)). That standard requires the Government to establish that the defendant "poses a concrete, prospective threat to public safety" that cannot be sufficiently mitigated by release conditions. *Id.* at 1280; *see also United States v. Salerno*, 481 U.S. 739, 751 (1987) (requiring the government to "prove[ ] by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community"). "Detention cannot be based on a finding that defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight; otherwise the scope of detention would extend beyond the limits set by Congress." *Munchel*, 991 F.3d at 1283.

### III.    DISCUSSION

Defendant Caldwell does not dispute that he is eligible for pre-trial detention pursuant to § 3142(f)(1)(A) for having been indicted for a "crime of violence," specifically for assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Count Two). *See* Gov's Opp'n at 11; *see United States v. Sabol*, Crim. Action No. 21-35-1 (EGS), 2021 WL 1405945, at *6–7 (D.D.C. Apr. 14, 2021) (holding that a defendant charged with a violation of 18 U.S.C. §§ 111(a)(1) and (b) is charged with a crime of

violence); *United States v. Klein*, Crim. No. 21-236 (JDB), 2021 WL 1377128, at *6 (D.D.C. Apr. 12, 2021) ("The D.C. Circuit has not weighed in, but every circuit to address the issue has . . . conclude[ed] that § 111(b) does constitute a crime of violence." (internal citations omitted)).[2]

Accordingly, the Court's inquiry is whether any "condition or combination of conditions will reasonably assure the appearance of [Defendant Caldwell] as required and the safety of any other person and the community." § 3142(e)(1). With respect to the danger Defendant Caldwell presents to the community, the Court must "identify an articulable threat posed by [him]," based upon a "factbound inquiry" including the "context" of the charged offenses. *Sabol*, 2021 WL1405945, at *7 (citing *Munchel*, 991 F.3d at 1283) (additional citations and quotation marks omitted). Defendant Caldwell and the Government agree that in determining whether Defendant Caldwell is a danger to the community, the Court considers the 18 U.S.C. § 3142(g) factors including: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence"; (3) "the history and characteristics" of the defendant; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." § 3142(g). Def.'s Mot. at 4; Gov.'s Opp'n at 11.

The Court shall consider these factors based upon the present record without holding an additional hearing with the same witnesses, which would not aid the Court's analysis. *See*

_____

[2] In addition, under § 3142(f)(1)(E), detention is permitted if a case involves "any felony . . . that involves the possession or use of a dangerous weapon." *Munchel*, 991 F.3d at 1281 (quoting § 3142(f)(1)(E)). Three additional charges in the Indictment appear to meet this description: Count Three (entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A)), Count Four (disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A)), and Count Five (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A)). Indictment at 2–4; *see e.g.*, *Munchel*, 991 F.3d at 1281 (concluding that defendants charged under §§ 1752(a)(1) and (a)(2) involving a "deadly or dangerous weapon" are eligible for pre-trial detention under § 3142(f)(1)(E)).

*Sheffield*, 799 F. Supp. 2d at 20 (permitting district court to use in its analysis the evidence relied on by the magistrate judge); *see also United States v. Anderson*, 384 F. Supp. 2d 32, 34 (D.D.C. 2005) (taking into consideration the indictment, "the briefs and other papers submitted by the parties, the proceedings before [the magistrate judge], the [magistrate's] findings of fact and conclusions of law, and the evidence and proffers before [the court]"). Based on the current record, the Court concludes that clear and convincing evidence supports a finding that no condition or combination of conditions will reasonably assure the safety of the community. Accordingly, the Court orders that Defendant Caldwell remain detained pending trial. *See* § 3142(e)(1).

### A. Nature and Circumstances of the Offense Charged

The Court first considers the "nature and circumstances of the offense charged" including "whether the offense is a crime of violence." § 3142(g)(1).

Despite the "serious and chilling nature" of the events that took place at the U.S. Capitol on January 6, the D.C. Circuit has made clear that detention is not appropriate in all cases involving "Capitol Riot" defendants. *Sabol*, 2021 WL 1405945, at *10 (citing *Munchel*, 991 F.3d at 1284); *see also Munchel*, 991 F.3d at 1284 ("In our view, those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."). Rather, the Court must consider the specific offenses with which Defendant Caldwell is charged and the conduct underlying those offenses. *United States v. Chrestman*, Case No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021). In so doing, the Court must "adequately demonstrate[ ] that it considered whether [Defendant Caldwell] pose[s] an articulable threat to the community in view of [his] conduct on January 6, and the particular circumstances of January 6." *Munchel*, 991 F.3d at 1283.

To aid in this consideration, Chief Judge Beryl A. Howell has articulated six "guideposts" for assessing "the comparative culpability of a given defendant in relation to fellow rioters": (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protesters before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's "words and movements during the riot"—*e.g.*, whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others." *Chrestman*, 2021 WL 765662, at *7–8. As with other courts in this jurisdiction, the Court finds these *Chrestman* guideposts persuasive for the purpose of differentiating among Capitol Riot defendants. *See, e.g.*, *United States v. DeGrave*, Criminal No. 21-0090 (PLF), 2021 WL 1940536, at *10 (D.D.C. May 14, 2021); *United States v. Whitton*, Crim. Action No. 21-35-5 (EGS), 2021 WL 1546931, at *7 (D.D.C. Apr. 20, 2021); *Sabol*, 2021 WL 1405945, at *10; *Klein*, 2021 WL 1377128, at *7; *United States v. Pezzola*, Criminal Action No. 21-52-1 (TJK), 2021 WL 1026125, at *6 (D.D.C. Mar. 16, 2021). Applied to Defendant Caldwell's conduct on January 6, 2021, these "guideposts" weigh in favor of continued pre-trial detention.

As to the first *Chrestman* factor, the Indictment charges Defendant Caldwell with five felony offenses and two misdemeanor offenses. "Felony charges are by definition more serious than misdemeanor charges; the nature of a felony offense is therefore substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense." *Chrestman*, 2021 WL 765662, at *7. In addition, § 3142(g)(1) specifically directs the Court to consider whether a defendant has been charged with a crime of violence, and at least one of the charged felonies—

15

using a dangerous weapon while assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) and (b), *see* Indictment, Count Two—is a crime of violence.  *See Sabol*, 2021 WL 1405945, at *6–7; *Whitton*, 2021 Wl1546931, at *5.  This offense carries a penalty of up to 20 years of imprisonment.  § 111(b).  Defendant Caldwell is also charged with three felony offenses under § 1752(a) (Counts Three, Four, and Five) while "us[ing] or carr[ying] a dangerous weapon, § 1752(b)(1), which carries a penalty of imprisonment for "not more than 10 years," § 1752(b)(1).  The gravity of these offenses  is undeniable, and weighs heavily in favor continued pre-trial detention

The second and third *Chrestman* factors—the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear" and whether the defendant used or carried a dangerous weapon—also heavily weigh in favor of pre-trial detention.  Evidence offered by the Government shows that Defendant Caldwell carried and *used* a chemical spray on law enforcement officers donned in riot gear.  That he brought this weapon with him to the Capitol, while also wearing glasses designed to prevent spray from penetrating his own eyes, suggests that Defendant Caldwell arrived at the Capitol with the intent to use the weapon—not, as he contends, merely to "express his opinion to the current political climate."  Def.'s Reply at 3.  Defendant Caldwell does not dispute that he carried a dangerous weapon, and concedes that there "is limited information that the defendant made prior planning in this case that he would pursue."  *Id.* at 2.  That he brought weapons and specialized gear with him to the Capitol shows that he "came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process[.]"  *Sabol*, 2021 WL 1405945 (quoting *Chrestman*, 2021 WL 765662, at *2).  This evidence of his prior planning and use of a dangerous weapon weighs in favor of detention.

The Court also finds that the sixth *Chrestman* factor, the defendant's "words and movements" during the riot, weighs strongly in favor of pre-trial detention, as they demonstrate that he acted "deliberately and dangerously." *Whitton*, 2021 WL 1546931, at *8. Specifically, according to Defendant Caldwell's own description of his actions in the ProPublica video, he "sprayed" approximately fifteen police officers as those officers were attempting to prevent rioters from reaching lawmakers. Gov.'s Opp'n at 8. Rather than complying with their directives, Defendant Caldwell told the officers that he would return spray and then did spray, according to him, approximately fifteen police officers. *Id.* These actions, as described by Defendant Caldwell himself, show a blatant disrespect for the role of law enforcement and their efforts to maintain the safety of the Capitol and the lawmakers inside. Defendant Caldwell, however, contends that this factor does not weigh in favor of detention because he did not "storm" the Capitol building. Def.'s Reply at 2. It is not clear to the Court whether Defendant Caldwell contends that he did not *enter* the building at all, or whether he is carefully selecting his words to suggest that he did not enter *by force*. Although there is presently no photographic or video evidence on the record showing Defendant Caldwell *inside* the Capitol building, the photographic and video evidence of his efforts to break up a barricaded line of police officers outside the building—who were attempting to prevent the rioters from breaking into the Capitol—by spraying them with a chemical spray, *see supra* Section I(A), as well as his own description of his actions during the day's events weigh in favor of detention.

The evidence regarding the fourth and fifth *Chrestman* factors is less clear-cut, but tilts in favor of detention. Although Defendant Caldwell contends that there is "zero evidence" that he "coordinated with other protestors before, during, or after the riot," he fails to address the photograph offered by the Government showing him using a Baofeng radio during the riot. *See*

Gov.'s Opp'n at 7, Figure 8.   The Government argues that his use of a radio demonstrates "coordination" with other individuals during the riot, which weighs in favor of continued pre-trial detention under the fourth *Chrestman* factor.   Gov.'s Opp'n at 13.   In his reply, Defendant Caldwell does not address this argument at all.   The evidence offered by the Government supports an inference that Defendant Caldwell was coordinating with other rioters, which is not controverted by Defendant Caldwell.

The Government also points to the photographs of Defendant Caldwell at the front of a crowd confronting a line of police officers, suggesting that he was a leader in dispersing the officers protecting the Capitol, in order to allow the rioters to breach the building.   *See* Gov.'s Opp'n at 6–7, Figures 5–7.   Defendant Caldwell again argues that there is "zero evidence" that he "held a leadership role in the planning or execution" of that day's events, but he does not meaningfully address the Government's argument.   The evidence proffered by the Government that these photographs demonstrate that he was at the forefront of a crowd confronting police officers, "flipping them off," and spraying them with chemical spray suggests he played a significant role in the efforts to disperse law enforcement officers who were protecting the Capitol, allowing rioters to break in to the building.

Considering these facts together, the Court concludes that the "nature and circumstances" of the offenses for which Defendant Caldwell is charged demonstrate a disregard for the law and a willingness to act violently—including against law enforcement officers.   Accordingly, the first 18 U.S.C. § 3142(g) factor weighs heavily in favor of detention on the basis that no condition or combination of conditions will reasonably assure the safety of the community. 18 U.S.C. §§ 3142(e)(1), 3142(g)(1).   Additionally, in view of "the substantial term of imprisonment" to which Defendant Caldwell is exposed for his offenses, this factor also weighs in favor of his continued

pre-trial detention, on the basis that no condition or combination of conditions will reasonably assure Defendant Caldwell's appearance as required. *Sabol*, 2021 WL 1405945, at *13 (citing 18 U.S.C. §§ 3142(e)(1), 3142(g)(1)); *see also United States v. Chansley*, Case No. 21-cr-3 (RCL), 2021 WL 861079, at *14 (D.D.C. Mar. 8, 2021))

**B. Weight of the Evidence**

The weight of the evidence against Defendant Caldwell also favors continued pre-trial detention.  § 3142(g)(2).  Multiple videos depict Defendant Caldwell spraying a visible chemical spray at law enforcement officers.  Defendant Caldwell also admitted in the ProPublica video, in his own words, that he sprayed fifteen law enforcement officers.  *See, e.g.*, *United States v. Cua*, Criminal Action No. 21-107 (RDM), 2021 WL 918255, at *4 (D.D.C. Mar. 10, 2021) (concluding that the second factor weighs in favor of detention based on the government's "video and photographic evidence, as well as social media posts by Cua in which he admits to breaching the Capitol on January 6").

Defendant Caldwell "cannot reasonably dispute" that he took these actions, *United States v. Fairlamb*, Case No. 21-cr-120-RCL, 2021 WL 1614821, at *7 (D.D.C. Apr. 26, 2021), and he makes no attempt to do so in his pleadings.  For example, he notes that the "government made the accusation through the photos that he used/carried a dangerous a weapon," without making any effort to rebut that charge.  Def.'s Reply at 2.  In light of the strength of the Government's evidence against Defendant Caldwell, the second factor weighs against granting Caldwell's request for release, on the basis that no condition or combination of conditions will reasonably assure the safety of the community.

### C. History and Characteristics of the Defendant

Under the third section 3142(g) factor, the Court must consider Defendant Caldwell's "history and characteristics," including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," and "whether, at the time of the current offense or arrest, [the defendant] was on probation, on parole, or on other release." § 3142(g)(3). The Court has carefully considered the information presented by both parties, and concludes that—although a close call—on balance, Defendant Caldwell's history and characteristics indicate that no condition or combination of conditions would reasonably assure the safety of the community.

Here, there are a number of factors that the Court will weigh. Defendant Caldwell is a former United States Marine, who was honorably discharged after five years of service. Def.'s Mot. at 5. He worked in the semiconductor industry for 25 years, including most recently at Texas Instruments for 12 years, *id.* at 5, but was fired from that position as a result of his arrest in this case.

Although Defendant Caldwell and Ms. Caldwell are divorced, they have lived together since approximately 2015 or 2016 and have three children together, including a teenaged-son who lives with them. He speaks to his father regularly. Hr'g Tr. (Feb. 22, 2021) at 19:3–16.

Defendant Caldwell's previous criminal history includes convictions for driving while intoxicated in 2006, disorderly conduct in 2008, and driving while intoxicated and resisting arrest in 2014. Def.'s Mot. at 5; Gov.'s Opp'n at 15. Defendant argues that this criminal history does not support a finding that he is a danger to the community, noting, for example, that he "has never been charged with a firearms offense or a crime of violence." Def.'s Mot. at 5. In response to

20

concerns noted by the magistrate judge regarding the incident between Defendant Caldwell and Ms. Caldwell which caused him to be arrested and charged with assault causing bodily injury, Defendant Caldwell notes that he and his ex-wife "have lived together for the past 5 years raising their children without incident" and that he was not convicted of assault stemming from this encounter.  Def.'s Mot. at 5–6, Def.'s Reply at 3.  He further indicates that he has appeared for all past court proceedings and complied with terms of probation based on his previous misdemeanor convictions.  Def.'s Reply at 3.

The Government contends that Defendant Caldwell's past charges evince violent tendencies, specifically discussing his violent altercation with Ms. Caldwell leading to his arrest for assault causing bodily injury, during which he ripped the phone out of the wall to prevent her from calling 911.  Gov.'s Opp'n at 16 ("[T]he police detailed that the Defendant slammed Ms. Caldwell's on a table, straddled her, picked her back up, sat her back down and picked her up again.").  The Government provides as an additional example of Defendant Caldwell's violent tendencies his charge for resisting arrest in connection with a driving while intoxicated offense, in which he "physically resisted officers" and "broke the hospital bed."  *Id.*

Although the Court recognizes that Defendant Caldwell has only been convicted of misdemeanor offenses, it is nonetheless troubled by the circumstances surrounding these offenses, particularly by Defendant Caldwell's acts of aggression in response to law enforcement intervention.  His history is even more concerning in light of his actions on January 6, 2021 and his "extreme disregard" for the safety of law enforcement officers, evidenced by the photographs provided by the Government and by Defendant Caldwell's own words in the ProPublica video that he sprayed approximately fifteen officers as they attempted to control the crowd.  *Whitton*, 2021 WL 1546931, at *10.

Consideration of whether Defendant Caldwell's history and characteristics weigh in favor of or against pre-trial detention is a close call. On balance, however, the Court finds the third § 3142(g) factor weighs against pretrial release on the basis that no condition or combination of conditions will reasonably assure the safety of the community.

### D. The Nature and Seriousness of the Danger Posed by Defendant's Release

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." § 3142(g)(4). "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," as it requires the Court to engage in an "open-ended assessment of the 'seriousness' of the risk to public safety." *Cua*, 2021 WL 918255, at *5 (quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure . . . the safety of any other person and the community,' 18 U.S.C. § 3142(e), it bears heavily on the Court's analysis." *Whitton*, 2021 WL 1546931, at *11 (quoting *Cua*, 2021 WL 918255, at *5).

As the D.C. Circuit recently explained in *Munchel*, the threat that an individual poses to the community must "be considered in context" and "whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." 991 F.3d at 1283. Accordingly, to the extent the Court's determination of the defendant's dangerousness relies on past political violence, the court must consider whether "the specific circumstances that made it possible" for that violence to arise are likely to manifest themselves again. *Id.* at 1284. This, in turn, requires the Court to consider whether the risk that a defendant poses can be mitigated by supervisory conditions, such as home detention or the presence of a third-party custodian. *See Klein*, 2021 WL 1377128, at *13.

As discussed above, Defendant Caldwell's conduct on January 6 evinces a clear disregard for the safety of others—and for law enforcement officers in particular. *See supra* Section III(A). The Government has shown by clear and convincing evidence that he employed chemical spray against multiple police officers. *See, e.g.*, *Fairlamb*, 2021 WL 1614821, at *8 ("[T]he defendant's willingness to assault a police officer on January 6—in the full view of other officers, scores of bystanders, and many cameras—confirms that, when enraged, he poses a danger to the community."). And the Government has also established that Defendant Caldwell came to the Capitol prepared to engage in such behavior both by bringing the weapon itself and by wearing eyewear to protect himself from its effects. *See, e.g.*, *Munchel*, 991 F.3d at 1284 ("[T]hose who actually assaulted police officers . . . are in a different category of dangerousness than those who cheered on the violence[.]").

Moreover, photographs show Defendant Caldwell at the front of a crowd, directly confronting a line of police officers. *See* Gov.'s Opp'n at 4–7, Figures 1–8. This evidence suggests that Defendant Caldwell was not a passive observer, but an active aggressor. And, in the ProPublica video, Defendant Caldwell stated himself that he discharged chemical spray against fifteen police officers *after* the police had discharged spray in a clear effort to control the rioters. *Id.* Defendant Caldwell's actions against police officers are deeply troubling, and plainly weigh in favor of the Court finding that he poses a serious danger to his community. *See Fairlamb*, 2021 WL 1614821, at *5 ("[I]f any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-clad police officer does."); *Chrestman*, 2021 WL 765662, at * 8 ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement" because such conduct demonstrates "disregard for the institutions of government and the rule of law[.]").

Although Defendant Caldwell acknowledges that he is charged with "serious" offenses, he nonetheless contends that "the mere fact that he disagreed with the current political climate on January 6, 2021, does not make him a danger to the community." Def.'s Reply at 4.  But Defendant Caldwell did not merely "disagree" or, as he otherwise puts it, engage in "protected speech." *Id.* at 3-4.  Rather—as the defendant himself described—he sprayed a chemical agent at law enforcement officers attempting to keep the Capitol building secure.  The Court finds unpersuasive Defendant Caldwell's contention that it is "reasonable to assume that [he] is not an ongoing danger of similar alleged activity." *Id.* at 2.

Consistent with other courts in this jurisdiction, the Court is unpersuaded by the argument that he does not present prospective danger to the community because the precise circumstances of January 6 may not recur. *See, e.g.*, *Sabol*, 2021 WL 1405945, at *18 ("While the circumstances of January 6, 2021 were unique, and the day has passed, it cannot be said that every Capitol Riot defendant is no longer a danger because those exact circumstances are unlikely to arise again.").  As the court articulated in *Whitton*, "even if the exact circumstances of the January 6 attacks are not 'continuing in nature' or 'likely to be repeated in the future,' the violent offenses [the defendant] committed that day are serious enough on their own to militate against pretrial release under this first Section 3142(g) factor." 2021 WL 1546931, at *9.  The same is true with respect to Defendant Caldwell. *See Munchel*, 991 F.2d at 1284 (observing that Capitol Riot defendants who acted violently are in a different category of dangerousness than those who did not).

Defendant Caldwell argues that imposing conditions on his release would assure the safety of the community and his appearance for court hearings.  Def.'s Mot. at 7. Defendant offers the following conditions as examples: "the surrender of his passport; GPS monitoring; being released

24

into the custody of a third-party custodian; restrictions on internet usage and communications; home confinement; alcohol and substance abuse counseling, and any other conditions the Court thinks necessary to ensure Mr. Caldwell's compliance." *Id.* at 7.  Based upon information provided by the Probation Office, the Eastern District of Texas does not have GPS monitoring capability, which means Defendant Caldwell's location cannot be monitored if he were to leave his residence. The Eastern District of Texas uses only radio frequency ("RF") monitoring.  Unlike GPS, RF can only monitor when a person is in his residence; it cannot track the person's whereabouts when he is out of his residence.

Moreover, the Court agrees with Magistrate Judge Johnson's conclusion that Defendant Caldwell has not identified a suitable third-party custodian.  The Court has taken into consideration Defendant Caldwell's proposed third-party custodians, and recognizes that either Ms. Caldwell or Mr. Caldwell would offer him a place to live if he were released.  However, the Court would not rely on either potential custodian to report potential violations, given the difficulty of relying on family members to report any violations of conditions—especially in light of the past violent interactions between Defendant Caldwell and Ms. Caldwell.  The family members may also not have a means to know his whereabouts or activities to be able to report any violations.  Although Defendant Caldwell might still be able to convince the Court that "appropriate conditions, including a suitable third-party custodian, would mitigate the risk to community safety that his release poses," he has not made that substantial showing here.  *Klein*, 2021 WL1751056, at *7.

In consideration of § 3142(g), and noting the D.C. Circuit's observation that "[i]t cannot be gainsaid that the violent breach of the [U.S.] Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community," *Munchel*, 991 F.3d 1273, the Court is persuaded that Defendant Caldwell poses a

danger to the community if he were to be released pending trial, and he "cannot be trusted to abide by any conditions of release that might be imposed instead of pretrial detention." *Chrestman*, 2021 WL 765662, at *16.

## IV.    CONCLUSION

For the foregoing reasons, upon careful consideration of Defendant Caldwell's  motion for revocation of the detention order, the Government's opposition, and Defendant Caldwell's reply, the evidence proffered by both parties, the entire record, and the factors set forth in 18 U.S.C. § 3142(g), the Court finds that all four statutory factors favor pretrial detention.  The Government has met its burden of establishing, by clear and convincing evidence, that no condition or combination of conditions can be imposed that would reasonably assure the safety of the community if Defendant Caldwell were released pending trial.  18 U.S.C. § 3142(e)(1).  The Court will therefore **DENY** Defendant Caldwell's motion.   An appropriate Order accompanies this Memorandum Opinion.

**Dated:** May 21, 2021

  /s/
COLLEEN KOLLAR-KOTELLY
United States District Judge