## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-00181-CKK** |
| | : | |
| **DANIEL RAY CALDWELL** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## OPPOSITION TO DEFENDANT'S MOTION FOR
## <u>RECONSIDERATION OF PRE-TRIAL RELEASE [ECF No. 37]</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant, Daniel Ray Caldwell, being released from pre-trial detention, and in opposition to his motion for reconsideration.  ECF No. 37.

The defendant should be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) [Crime of Violence].  Moreover, the defendant should be detained pending trial pursuant to 18 U.S.C. §§ 3142(e) and (f)(2). The Court should order the defendant detained because there are no conditions or combination of conditions which will reasonably assure the appearance of the defendant as required and ensure the safety of any other person and the community.  In fully considering the defendant's argument in his Appeal of the Magistrate's Order of Pre-Trial Detention, the Court held that "the Court is persuaded that Defendant Caldwell poses a danger to the community if he were to be released pending trial, and he 'cannot be trusted to abide by any conditions of release that might be imposed instead of pretrial detention.'"  Memorandum Opinion, *United States v. Caldwell*, No. 21-181 (CKK) ECF No. 25, pg. 25-6.  Nothing has materially changed since this court's decision.  Defendant Caldwell should, therefore, continue to be held.

The Court can reconsider pretrial detention at any time before trial if the judicial officer finds that "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2); *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014). In other words, the statute requires that a movant provide information that is both "new" and "material." *See United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020).

In this case, the defendant has not offered any "new" information and the information proffered is not material. Rather, Defendant Caldwell re-presents much of the same information that was previously considered by the Court and rejected. *See* Memorandum Opinion, *United States v. Caldwell*, No. 21-181 (CKK) ECF No. 25. His motion for reconsideration should, therefore, be denied.

## **BACKGROUND**

1.     **Procedural Posture**

The defendant was arrested in Texas on February 10, 2021. He appeared before Magistrate Judge Kimberly C. Priest Johnson in a detention hearing on February 22, 2021 and continued to March 4, 2021. Judge Johnson issued an order of detention pending trial and a commitment to another district while the defendant was remanded to the custody of the U.S. Marshals for transport to the District of Columbia.

On March 3, 2021, an indictment was returned with respect to Caldwell, charging him with the following seven counts:

1.   Obstruction of Law Enforcement During Civil Disorder (18 U.S.C. § 231(a)(3)) (5 year max);
2.   Inflicting Bodily Injury on Certain Officers (18 U.S.C. § 111(a)(1), and (b)) (20 year max);
3.   Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority

2

with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(1), (b)(1)(A)) (10 year max);

4.  **Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon** (18 U.S.C. § 1752(a)(2), (b)(1)(A)) (10 year max);

5.  **Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon** (18 U.S.C. § 1752(a)(4), (b)(1)(A)) (10 year max);

6.  **Violent Entry and Disorderly Conduct on Capitol Grounds** (40 U.S.C. § 5104(e)(2)) (6 month max)

7.  **Act of Physical Violence in the Capitol Grounds or Buildings** (40 U.S.C. § 5104(e)(2)(F)) (6 month max).

## FACTUAL BACKGROUND

The defendant, Daniel Ray Caldwell, has been indicted on seven counts, as previously detailed, arising from his participation in a riot that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C. on January 6, 2021.  To avoid exposition, the government refers to its previously filed Opposition to Pre-Trial Release, which contains the general summary of the attack on the U.S. Capitol along with details about the defendant's criminal actions on January 6 and thereafter.  The government incorporates by reference its factual statement, and arguments, contained in that prior Opposition to Pre-Trial Release.  ECF No. 22.

Subsequent to the first motion for pre-trial release, the government learned that the defendant also made entry into the United States Capitol.  *See* Figure One.



*Figure One*

The government was unaware of defendant Caldwell's entry into the Capitol at the time of the

last detention hearing.  The government believes the evidence demonstrates that, after he sprayed

law-enforcement officers with a chemical irritant at the Lower West Terrace, the defendant made

his way to the Upper West Terrace and gained entry into the Capitol Building itself through the

Senate Wing Door.  The defendant acknowledges as much, stating:

> The evidence further establishes that at some point the defendant entered the U.S.
> Capital.  The defendant did not employ force to accomplish this feat. Once inside the
> Capital the defendant took photographs and soon thereafter departed.

Motion to Reconsider, Pg. 5.  ECF No. 37.  Defendant further states that:

> While there is no evidence that the defendant physically came into contact with any law
> enforcement officials, there is evidence that the defendant deployed a spray mist in the
> general direction of law enforcement officers.

Motion to Reconsider, Pg. 4.  ECF No. 37.  The government disagrees with this characterization,

and suggests that the evidence establishes that the defendant directly sprayed the line of officers

in front of him:



*Figure Two*

Furthermore, it is clear that the defendant's spray directly hit and impacted the officers:



*Figure Three*

In an interview with one of the officers sprayed, the officer said:

> At some point, [the officer] picked up a shield that was dropped by a fellow officer. Protesters grabbed at the shield so [the officer] rested the shield on the ground, holding it with one hand, and pepper spray in her other. A man in camouflage emerged from the crowd near the police line and began to spray an unknown substance. [The officer] did not have the shield up to protect her eyes and was forced to fall back to recover from the effects of the spray. [The officer] initially thought the man in camouflage had picked up a large canister of pepper spray carried by MPD Lieutenants, but the effects of the spray were different. [The officer] had been sprayed by the irritant that MPD officers carry prior, however, the substance sprayed by the man in camouflage was worse and longer lasting. The spray caused [the officer] to cough, temporary impaired her vision, and left orange residue on her and other officer's face and clothing.
>
> [The officer] recovered behind a barrier for five to ten minutes and returned to the police line.

The video evidence disclosed corroborates that the officers were directly hit by the chemical irritant sprayed by Caldwell. Accordingly, the evidence demonstrates that the defendant

physically came into contact with several law-enforcement officers when he sprayed them with a chemical irritant.



*Figure Four*

The evidence disclosed further demonstrates that Caldwell came prepared to assault law enforcement officers with a chemical irritant. Approximately nine minutes before spraying the officers, Caldwell is seen and can be heard at the barricade line at the Lower West Terrace.



*Figure Five*

Caldwell can be heard taunting law enforcement officers that they should receive a Purple Heart for spraying or being sprayed by the crowd saying words to the effect of "you're going to get ribbons for this shit."  A few seconds later Caldwell asks how many veterans are on the other side of the fence saying you swore to an oath twice and "turn around and go get the fucking enemy."

The incontrovertible evidence also rebuts any claim that the "defendant's actions were in direct response to those perpetrated by law-enforcement."  Motion to Reconsider, Pg. 4-5.  ECF No. 37.   As the above-referenced photo in Figure Three shows, the defendant sprayed the officers at approximately 2:05:16 at the Lower West Terrace.  The government has disclosed Body Worn Camera (BWC) video footage that covers the period of the defendant's assaults.  The BWC footage shows a scene of utter chaos on the Lower West Terrace (LWT), with rioters repeatedly assaulting officers.  Quite simply, the officers at the LWT were under attack.   At 2:00 pm, rioters had arrived at the West Plaza of the Capitol (an area on the ground level of the Capitol Grounds, below the LWT), however U.S. Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers had formed a police line with barricades to keep the rioters from ascending to the Capitol, as shown in the still from USCP surveillance below.



*Figure Six*

The defendant was in the vanguard of rioters that first started clashing with police at the West

Plaza.  At approximately 2:04, on the West Plaza of the Capitol, rioters charged at the police

line.  Other defendants pushed rioters up a set of steps so that rioters slammed into a line of

officers.  Rioters then continued to push at the line, slamming into a shield held by and MPD

Officer.  Notably, at least one (unidentified) MPD officer was pulled out into the crowd during

these assaults.  *See* Government's Opposition to Defendant's Motion for Pre-Trial Release,

*United States v. Jeffrey Sabol*, NO. 1:21-cr-35-EGS-1 (D.D.C.) ECF No. 119, pg. 4-5.

     As is clear from the Sabol pleading and accompanying video stills, chaos and violence

caused by rioters was wide-spread on the Lower West Terrace just before the defendant sprayed

law-enforcement.  At 2:04:40, approximately thirty-six seconds before the defendant sprays law-

enforcement, a man attacks the police line:



*Figure Seven*

At 2:04:41, an officer can be seen helping another downed officer:



*Figure Eight*

At 2:04:45, a man threatens officers with a pole:



*Figure Nine*

At 2:05:12, an MPD officer does deploy pepper spray:



*Figure Ten*

1.      **The November 30, 2021 Amended Motion for Reconsideration**

The government has received and reviewed defendant Caldwell's Amended Motion and Memorandum in Support of Reconsideration.  ECF No. 38.  The government does not object the to the timing of the recent amended pleading, but does not agree with the factual statements made therein.

The government suggests that a review of the video evidence produced rebuts the claims made in the amended pleading and supports the Courts' Memorandum Opinion issued on May 21, 2021.  First, defendant Caldwell argues that he used the baofeng walkie-talkie at the Capitol to listen to FM radio.  A review of the BWC video of the screen capture referenced in the government's original filing shows that the "listening to FM radio" argument strains credibility. *See* Government Opposition to Motion for Pre-Trial Release, ECF No. 22, pg. 7.  Defendant Caldwell can also clearly be seen *talking* into the baofeng walkie-talkie:



*Figure Eleven*



*Figure Twelve*

More damaging to his "listening to news accounts of the events on January 6" claim is the fact that seconds after talking into the baofeng walkie-talkie, Caldwell can be seen checking his mobile device, a much better source of "news accounts:"



*Figure Thirteen*

Defendant Caldwell's amended claim that he was wearing protective glasses to shield himself from the sun, and not the effects of police spray, is also unpersuasive for the simple fact that it was cloudy that day:

11



*Figure Fourteen*

https://weather.com/weather/monthly/l/Washington+DC?canonicalCityId=4c0ca6d01716c299f5 3606df83d99d5eb96b2ee0efbe3cd15d35ddd29dee93b2.

## **ARGUMENT**

### **I.    The defendant presents no new and material facts justifying release**

The Court can reconsider pretrial detention at any time before trial if the judicial officer finds that "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2); *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014). In other words, the statute requires that a movant provide information that is both "new" and "material." *See United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020).

Previously available information—even if "material"—is not grounds to reopen a detention hearing. *See Lee*, 451 F. Supp. 3d at 5. And any "new" information is only "material" if it is "essential to, or capable of significantly affecting, the detention decision." *United States v.*

*Worrell*, 2021 WL 2366934 at *9 (D.D.C. June 9, 2021); *see also Lee*, 451 F. Supp. 3d at 5 (stating that, for purposes of reopening a detention hearing, information has a "material bearing" on detention if it "casts different light on any of [the Bail Reform Act] factors," and citing Black's Law Dictionary (11th ed. 2019), which defines "material" as "[h]aving some logical connection with the consequential facts" or "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential.")).

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)). Thus, a detention hearing must be held at the government's request only "in a case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B). The BRA "requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *Salerno*, 481 U.S. at 755.  This Court previously found that "The Government has met its burden of establishing, by clear and convincing evidence, that no condition or combination of conditions can be imposed that would reasonably assure the safety of the community if Defendant Caldwell were released pending trial."  Memorandum Opinion, *United States v. Caldwell*, No. 21-181 (CKK) ECF No. 25, pg. 26.

The charges brought against Caldwell triggered a detention hearing under 18 U.S.C.

3142(f)(1)(A) ("crime of violence"), defined broadly as "an offense that has as an element of … physical force" or a felony that "by its nature, involves a substantial risk that physical force against the person or property of another." 18 USC § 3156(a)(4). This case also involves "a serious risk that such person will flee." 18 U.S.C. § 3142(f)(2)(A). Accordingly, the Court "shall hold a hearing to determine whether any condition or combination of conditions … will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. 3142(f). The Court held such a hearing in the Eastern District of Texas on February 22, 2021 and March 4, 2021.

Having reviewed the evidence in this case, Magistrate Judge Johnson found that pursuant to 18 U.S.C. § 3142(e)(3), there is a rebuttable presumption that no condition or conditions will reasonably assure the appearance of the defendant and the safety of the community because there is probable cause the defendant committed an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a term of imprisonment of 10 years or more is attached. Order of Det. 2, ECF No. 11. To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the judicial officer shall consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(l)-(4). Magistrate Judge Johnson reviewed such factors and made the appropriate decision to detain the Defendant.  When a magistrate's detention order is reviewed by the trial court, courts in this district have held, in line with courts across the country, that such detention decisions are reviewed de novo. *See United States v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017); *see also United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662

(D.D.C. Feb. 26, 2021) at 5-6.  Caldwell does not contest that he is eligible for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), having been indicted with a crime of violence - Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b).

The gravity of the conduct that occurred at the U.S. Capitol on January 6, 2021, cannot be overstated. *United States v. Sabol*, No. 21-cr-35-EGS (D.D.C. April 14, 2021), Memorandum Opinion (ECF No. 56) at 27, citing *United States v. Munchel*, No. 21-3010, 2021 WL 1149196 at 4 (D.C. Cir. March 26, 2021) 27.  "This was a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *Id.*, citing *United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021).  During the course of the January 6, 2021, siege of the U.S. Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals armed with baseball bats, stun guns, fireworks, and pepper spray, among other dangerous weapons. Specific members of the mob targeted the individual officers assigned to protect the Capitol as part of a coordinated effort to breach the police lines, break through the doors of the Capitol, and achieve their goal of interfering with the certification of the Presidential election. Simply put, without the violent efforts of these specific individuals to injure and/or incapacitate law enforcement officers who were executing their duties and protecting our democracy, the barrier lines would never have been breached, and rioters would likely not have gained entry into the Capitol Building.

The defendant offers no new evidence that was not fully available at the time of his prior detention hearing.  The defendant offers testimonials and letters in support of his motion, but those individuals were available at the time of the prior hearing.  *See* Defendant's Exhibit 3.  In fact,

some of the information is duplicative.  Both the defendant's father and former wife presented

evidence in the initial detention hearing.  His claims concerning the facts and circumstances of the

case are also not new, or newly discovered.[1]  The defendant also argues that the conditions of his

confinement support release, but does not cite any applicable legal authority in support of his

motion.   The defendant further argues that the delay of the case supports his release, but cites no

applicable law in support of that specific claim.

### A.      The defendant has not demonstrated that any delays justify his release

The government does not dispute that under certain circumstances, pre-trial delay can enter

into the detention calculus.  *See United States v. Ojeda-Rios*, 846 F.2d 167 (2d Cir. 1988).  *See*

*also United States v. Whitehorn*, No. 88-0145 (HHG), 1989 U.S. Dist. LEXIS 6460 (D.D.C., Jun.

8, 1989).  Those circumstances, however, are not present in this case.  The government has not

delayed the prosecution of the defendant through the use of an interlocutory appeal involving a co-

defendant's case.  The government has not taken any action to delay the progress of the case.  Here,

the defendant fired his first retained counsel, thus necessitating some of the delay.  The government

has also been diligent in producing discovery.  The defendant acknowledges that "The volume of

the disclosures will require an extensive amount of time for both the defendant and counsel to

properly review." ECF No. 37, pg. 8. *See United States v. Leake*, No. 19-cr-194, 2020 WL 1905150

(D.D.C., Apr. 17, 2020), *United States v. Taylor*, No. 18-198, 2020 U.S. Dist. LEXIS 232741

(D.D.C. Dec. 10, 2020), *United States v. Green*, No. 4:20cr1, 2020 WL 5877893 (E.D. VA, Oct.

2, 2020).

---

[1] Based upon information and belief, the photograph included as Exhibit 2 is not a photograph that involves the defendant, or the circumstances of his crime.  *See* https://www.westernmassnews.com/pro-trump-protesters-and-police-clash-on-top-of-the-capitol/image_417d01e1-8326-54ae-978e-708dcceadd4b.html, last accessed November 23, 2021.

**B.     The defendant has not demonstrated that the conditions at the Department of Corrections justify his release**

The Defendant's claims that "the current detention conditions of the defendant further frustrate his ability to adequately prepare for his defense" do not establish that he is entitled to the relief he seeks. The Defendant claims that the conditions at the jail make it difficult for him to access to the voluminous discovery provided by the government in this case to date. ECF No. 37, pg. 8   For these reasons, among others, the Defendant asserts that he should be released. To be sure, the defendant is entitled to reasonable access to discovery and the opportunity to meaningfully confer with counsel. But the defendant cites no authority suggesting that his complaints justify reopening the detention hearing and ordering his release.  Indeed, the concerns raised by the defendant are entirely independent of the factors this Court must analyze in making a detention decision under the Bail Reform Act.

As this Court knows, on March 30, 2020, a civil complaint was filed in the United States District Court for the District of Columbia, on behalf of defendants detained at the Central Detention Facility and Central Treatment Facility (CTF), alleging that by the D.C. Department of Corrections (DOC) was failing to take reasonable precautions to prevent the spread and severity of a COVID-19 outbreak.  That case, *Banks v. Booth* (20-cv-849), was assigned to this Court, who on April 19, 2020 issued a temporary restraining order (ECF No. 48), and on June 18, 2020, issued a preliminary injunction (ECF No. 100) that addressed, in part inmates' access to confidential legal calls in light of enhanced restrictions in place to address the pandemic, and ordered DOC to ensure that all inmates have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters, and to "swiftly implement to use of such technology" necessary to accomplish this (ECF No. 100 at 39).

On December 12, 2020, amici filed a report to provide information to the Court regarding

DOC's compliance with the Court's June 18, 2020, preliminary injunction (ECF No. 138). That report noted that the DOC had purchased significant amounts of new technology to facilitate attorney client communications, including through the use of cell phones from within their cells; and that the DOC facilitated more than 1500 such calls each month. The report also noted that DOC had purchased a number of tablets that inmates were permitted to use to review discovery and to communicate with their attorneys using secure messaging (ECF No. 139 at 42). Finally, the report noted that the DOC facilitated 1,209 videoconferences between attorneys and their clients between May and October 2020 (Id. at 40-41).

On March 15, 2021, DOC issued a new procedure for voluminous electronic discovery. The policy would allow him to review electronic materials in his cell on a laptop provided by DOC. The government's position is that this procedure satisfies the requirements of the Protective Order regarding discovery in this case, so it would not limit the defendant's access to sensitive materials.

The defendant similarly cites no authority—and the government is not aware of any—standing for the proposition that restrictive housing or any of the other conditions at the jail raised by the defendant entitle him to release under the Bail Reform Act, which is the relief he seeks in this motion. Yet the information he proffers does not meet the standard set out in the Bail Reform Act, whether to reopen the hearing or to support a decision to release the defendant on the merits.

To be clear, the government is committed to ensuring the safety all of inmates, regardless of their detention status. But it is also critical, from the government's perspective, to allow the issues to be properly litigated in their proper course. Civil litigation is the proper venue to address complaints of mistreatment by the jail. *See United States v. Brooks*, 2020 U.S. Dist. LEXIS 230323, at *10 (D.D.C. Dec. 7, 2020) ("As the government correctly rejoins, any such

constitutional claim must be raised via a separate civil suit and cannot be part of a compassionate-release motion in the underlying criminal case. Courts all over the country have concurred."); *United States v. Smith*, 2020 U.S. Dist. LEXIS 213050, 2020 WL 6702173, at *6 n.8 (S.D. Ohio Nov. 13, 2020) (collecting cases); *see, also, e.g., United States v. Banks*, 422 F. App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion filed in his criminal case was not the proper vehicle for raising the claims about prison conditions contained in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006) (noting that, because the defendants' "challenge[s] to the conditions of confinement . . . were raised in motions filed in their respective criminal cases . . . they were properly denied by the district court").

The proper way to raise such a claim is to file a civil suit against the Department of Corrections or its warden. *See*, e.g., *United States v. Folse*, Nos. CR 15-2485 JB, CR 15-3883 JB, 2016 WL 3996386, at *15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement."); *United States v. Luong*, No. Cr. 99-433 WBS GGH, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009) ("As several courts have recognized, the proper procedure to redress a defendant's grievances regarding treatment within a jail or prison is to file a civil suit against the relevant parties . . . rather than a motion in his criminal case."); *United States v. Wells*, Cr. No. 3:02CR-20-H, 2007 WL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action."); *Campbell v. McGruder*, 416 F. Supp. 100, 101 (D.D.C. 1975) (addressing "class action brought by unconvicted pre-trial detainees incarcerated at the District of Columbia jail"). Here, as discussed above, the Bail Reform factors, even taking into consideration the circumstances of COVID-19 and this defendant, remain in favor

of detention.

## II.     Analysis of the Bail Reform Act Factors Shows the Defendant Should Remain Detained

The defendant's conduct on January 6th must be analyzed against the background of the Capitol Riots. Without their premeditated actions to break down the police line and directly attack officers in concert with likeminded rioters, a breach of the Capitol could not have occurred. While the government understands that not all participants in the riot are deserving of pretrial detention, those, like the defendant, who, without provocation, directly assaulted multiple law enforcement officers with dangerous weapons certainly belong in the most serious category of culpability. *See Chrestman*, 2021 WL 765662 at 8. ("The conduct of a defendant who injured, attempted to injure, or threatened to injure others, or who damaged or attempted to damage federal property, is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises.")  The assault on uniformed law enforcement officers gives rise to "grave concerns" regarding the dangerousness of the defendants. *Id*. ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement," because such conduct demonstrates "disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community").

The court in *Chrestman* articulated six "guideposts" for assessing "the comparative culpability of a given defendant in relation to fellow rioters." *Id*. The guideposts are as follows: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other

20

protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the

events of January 6, 2021; and (6) the defendant's "words and movements during the riot"—e.g.,

whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into

the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure

others." *Id*. at 7-8. These factors, "[t]aken together, as applied to a given defendant, . . . are

probative of 'the nature and circumstances of the offense charged,' 18 U.S.C. § 3142(g)(1), and,

in turn, of the danger posed by the defendant." *Sabol*, Memorandum Opinion at 28-29.

In this case, five of the six guideposts as applied to Caldwell weigh overwhelmingly

towards a finding of dangerousness.   The defendant is charged with felonies as opposed to

misdemeanors.   The defendant obtained a cannister of a chemical weapons specifically in

anticipation of travelling to Washington, D.C. for the January 6 event.  Caldwell used a dangerous

weapon, that is, a chemical spray.  There is evidence of coordination, as demonstrated by the use

of a Baofeng radio during the riot.  Finally, Caldwell injured or attempted to injure others by

attacking multiple officers.  An application of the *Chrestman* guideposts to the facts before this

Court make it clear that Caldwell should be detained.  *See Munchel*, 2021 WL 1149196 at 8 ("those

who actually assaulted police officers and broke through windows, doors and barricades, and those

who aided, conspired with, planned, or coordinated such actions, are in a different category of

dangerousness than those who cheered on the violence or entered the Capitol after others cleared

the way." *Id*.). In distinguishing those cases from the *Munchel* decision, Judge Emmet G. Sullivan

held,

> "While the circumstances of January 6, 2021 were unique, and the
> day has passed, it cannot be said that every Capitol Riot defendant
> is no longer a danger because those exact circumstances are unlikely
> to arise again. The D.C. Circuit certainly did not say as much;
> instead, the court observed that for the defendants in that case who
> 'did not vandalize any property or commit violence, the presence of

the group was critical to their ability to obstruct the vote and to cause danger to the community.'"

*Sabol*   at 60, quoting *Munchel* at 8.   This Court has found as much, holding that "Applied to Defendant Caldwell's conduct on January 6, 2021, these 'guideposts' weigh in favor of continued pre-trial detention."  Memorandum Opinion, *United States v. Caldwell*, No. 21-181 (CKK) ECF No. 25, pg. 26.

In particular, using chemical spray against law enforcement is an extremely serious offense.  In a recent decision, Acting Chief Judge Contreras noted the seriousness of the spraying assaults in detaining a Capitol riot defendant.  *United States v. Brown*, --- F. App'x ---, 2021 U.S. Dist. LEXIS 167405, at *14-15 (D.D.C. Sept. 3, 2021).[2]

### A.    The Court should continue to hold the Defendant pursuant to 18 U.S.C. § 3142(e)

The United States submits that there continue to be no condition or combination of conditions the Court could impose that would reasonably assure the safety of the community or the appearance of the defendant, which is in line with Magistrate Johnson's decision pursuant to 18 U.S.C. § 3142(e)(3), in which the factors under 18 U.S.C. § 3142(g)(1-4) were considered. The Court should continue to deny release pursuant to those factors.

---

[2] The government notes that there are many such cases where the defendants have been detained. The Memorandum Opinion in *Brown* notes four other cases in which rioters who deployed chemical spray at law enforcement were ordered detained: *United States v. Khater*, --- F. App'x-- 2021 WL 3711402, at *1 (D.C. Cir. July 26, 2021); *United States v. Quaglin*, 851 F. App'x 218, 219 (D.C. Cir. June 24, 2021); *United States v. Worrell*, 848 F. App'x 5, 6 (D.C. Cir. June 14, 2021); and *United States v. Gieswein*, 2021 U.S. Dist. LEXIS 139235, at 3168148, at *7, *10, *35, *50 (D.D.C. July 27, 2021).  *Brown*, 2021 U.S. Dist. LEXIS 167405, at *14-15. The government is aware of at least four other such cases: *United States v. Mattice*, Case No. 1:21-mj-00622 (RMM); *United States v. Lazar*, 1:21-cr-00525-ABJ; *United States v. McHugh*, 1:21-cr-00453-JDB; and *United States v. Schwartz*, l :21-cr-00178-APM.  Additionally, the defendant in *United States v. Mitchell Todd Gardner, II*, l :21-cr-00622-APM (including an allegation that the defendant deployed a lachrymal agent against law enforcement officers in the Lower West Terrace tunnel) is on pretrial release because the government did not seek detention.

*(1) The Nature and Circumstances of the Offense Charged*:

The defendant has been charged with grave offenses. He forcibly entered and remained on the Capitol grounds and by his actions, worked to delay and hinder Congress's certification of the Electoral College vote. He was at the front of the crowd talking to and flipping off officers, taunting them before deciding to unleash spray on a large group of officers, knowing full well the effect of prolonged spray on the officers who were trying to calm and disperse an angry crowd.

Instead of showing remorse for his actions, he touted his efforts in the ProPublica video by proudly stating he threatened the officers for spraying the crowd by returning spray back to them. As stated by Chief Judge Beryl A. Howell, "[t]he actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law." *See United States v. Chestman*, 21-mj-218 (BAH), ECF No. 23, at *13, 16 (D.D.C. February 26, 2021) ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification").

*(2) The Weight of Evidence Against the Person*:

Substantial evidence supports the position that Caldwell poses a threat to the community. Caldwell's violent actions at the Capitol were captured on film, through United States Capitol Police video, social media footage, and an interview given by Caldwell himself. Caldwell confirmed his presence at the Capitol and then recounted with pride the actions taken in retaliation for officers who were trying to maintain peace and trying to disperse an angry crowd that had already caused an immense amount of violence and destruction. The weight of the evidence thus strongly supports a finding that no conditions of release would protect the community.

*(3) History and Characteristics of the Person*:

The United States adopts the factual proffer related to the defendant's history and characteristics in the February 14, 2021 pretrial services report generated by the  United States Probation Officer in Texas. The Defendant has a 2006 conviction for Driving While Intoxicated in Newburgh Town, New York, a 2008 conviction for Disorderly Conduct and Assault Causes Bodily Injury – Family Violence from The Colony, Texas, and a 2013 conviction for Driving While Intoxicated and Resisting Arrest in Denison, Texas.

As described in Magistrate Judge Johnson's order, several third-party custodians were presented by defense as suitable places for Caldwell to live. However, Ms. Caldwell, the Defendant' ex-wife would not provide details of the Defendant's estrangement from his mother and two brothers. Order of Det. 5, ECF No. 11. Ms. Caldwell gave hesitatant answers to whether she ever heard the Defendant make racist comments. In contradiction of her interview with Agent Webb at the time the search warrant of their premise was executed, Ms. Caldwell admitted in the detention hearing that the Defendant had previous DUIs and that the police were called due to a domestic situation in which things "escalated", according to her view. In contrast, the police detailed that the Defendant slammed Ms. Caldwell's on a table, straddled her, picked her back up, sat her back down and picked her up again. She was confronted with the fact that the she was not able to call 911 because the Defendant ripped the phone from the wall and once confronted with this information, she admitted she sought a restraining order and began divorce proceedings against the defendant. *Id.* at 5-6. She admitted that the Defendant owned nineteen firearms, two of which belong to her. Although these firearms are now at her daughter's house, the large number of firearms owned by a person who has exhibited the level of violence displayed by Caldwell is alarming. *Id.* at 6. In Defendant's Motion to Revoke or Amend Magistrate's Order of Pretrial Detention, Defendant claims that that fact that he and his ex-wife have lived together for the past

five years and raised their children is evidence that he can be released to their home. Def's Mot. at 5-6. However, as the Court noted in its order, there is sufficient evidence that Ms. Caldwell would not report issues even if they did arise with the Defendant and so the mere fact that they have lived together for several years did not convince the Court, and should continue to dissuade this Court, from believing that the Defendant's release will guarantee accountability and honest reporting of issues.

At the continued detention hearing on March 4, 2021, the Defendant's father testified on behalf of his son. When asked about the Defendant's arrest in Dennison, Texas for driving while intoxicated and resisting arrest in which he physically resisted officers, the Defendant had to be restrained to have blood drawn at the hospital and broke the hospital bed. *Id.* Despite being confronted with this information, Caldwell's father felt the Defendant would respect him and follow instructions.

Judge Johnson found that neither custodian was appropriate as placement for the Defendant as Ms. Caldwell may not truthfully contact the Court if the Defendant violated conditions of his release and that Mr. Caldwell (Defendant's father) being unaware of the Defendant's previous acts of violence will result in his being unable to enforce conditions of release and similarly, casts doubts on whether he would truthfully contact the Court if the Defendant violated conditions of his release. Order of Det. 7, ECF No. 11.

In his motion, Defendant claims that he is not a risk for nonappearance, and then cites information presented at the detention hearing in the Eastern District of Texas that he was fired from his job at Texas Instruments. Def's Mot. at 4-5.  This is precisely the kind of evidence that demonstrates his elevated risk of not appearing due to the lack of income stability and an employment tie keeping him in Texas if he were released. Moreover, the Defendant's Pretrial

Services Report cites that the Defendant is at risk for nonappearance due to his substance abuse history.

For all of these reasons, Magistrate Judge Johnson reached the well-supported conclusion that no condition or combination of conditions would reasonably assure the appearance of the defendant as required and the safety of the community.

*(4) Nature and Seriousness of the Danger to Community*:

The defendant's words and actions evince a serious threat to the community. Per *Chrestman*, grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. 21-mj-218, at *13. On several occasions, Caldwell sprays without regards for several seconds in the directions of several Officers, without any regarding for their well-being or purposes in stopping rioters from advancing on the Capitol.  As was demonstrated in other instances of spraying seriously injuring Officers, Caldwell put these Officers in severe risk of harm with his spray. *See Chrestman*, at *30 ("Nearly as significant is defendant's use of force to advance towards the Capitol and his use of words to lead and guide the mob in obstructing the police and pushing against police barriers"). He also cursed at and pulled his middle finger out at the Officers, which displays the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.  Recently in an assault on a law-enforcement case, the District Court identified and articulated the threat to the community and commented that "the defendant's willingness to assault a police officer on January 6—in the full view of other officers, scores of bystanders, and many

cameras—confirms that, when enraged, he poses a danger to the community."  *United States v.*

*Scott Fairlamb*, Case No. 1:21-cr-120-RCL (D. D.C., Apr. 26, 2021) ECF No. 31, pg. 17.

Caldwell then displayed no remorse for his actions, touting the fact that he shouted back at

the officers that if they sprayed him, he would spray them back.



*Figure Fifteen*

Caldwell's conduct on January 6, 2021 was not a response to law-enforcement conduct, it was a

call to action.   All of the release conditions available to the Court depend-at least in part-on

voluntary compliance. Accordingly, the potential danger Caldwell poses to the community

strongly supports a finding that no conditions of release would protect the community.

## **CONCLUSION**

The defendant has not proffered any new facts that would materially alter this Court's

decision to detain the defendant, following a thorough consideration of his claims on May 21,

2021.  For the foregoing reasons, and any as may be cited at a hearing on this motion, the

defendant's motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

*/s/ James D. Peterson*
JAMES D. PETERSON
VA Bar 35373
James D. Peterson
Trial Attorney
Criminal Division
United States Department of Justice
1331 F Street N.W.
6th Floor
SAUSA
U.S. Attorney's Office for the District of Columbia
Washington, D.C. 20530
(202) 353-0796
James.d.peterson@usdoj.gov