**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| **v.** | :  **Case No. 21-CR-00181-CKK** |
| | : |
| **DANIEL RAY CALDWELL** | : |
| | : |
| **Defendant.** | : |
| ————————————————— | : |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Daniel Ray Caldwell to 70 months of incarceration, the midpoint of the applicable advisory Sentencing Guidelines range of 63 to 78 months, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.    INTRODUCTION

The defendant, Daniel Ray Caldwell, violently attacked the United States Capitol on January 6, 2021—providing valuable aid to a mob that interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in damage.[1]

Caldwell, a Marine veteran and former IT worker for Texas Instruments, planned for

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

violence on January 6.  He armed himself with bear spray, outfitted himself with glasses that could protect himself from some of the effects of pepper spray, and brought a Baofeng hand held two-way radio that could send and/or receive communications during the riot.  After spraying a line of officers protecting the Lower West Terrace Plaza area, he made his way up to the Capitol Building and entered through the Senate Wing door.  During the riot, Caldwell taunted police officers by asking them to spray, and asking if they were "scared."

Accordingly, the government recommends that the Court sentence Caldwell to 70 months of incarceration, which is near the middle of the applicable advisory Guidelines' range of 63 to 78 months.  A 70-month sentence reflects the gravity of Caldwell's conduct, credits his acceptance of responsibility, and meets the needs of general and specific deterrence.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, a brief summary of the assault on the United States Capitol is set forth in ¶¶ 1-7 of the Statement of Offense in this case, ECF. No. 55.  On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.

### 1.    *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry

into the United States Capitol Building on January 6, 2021 possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against

3

the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Figure 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza" Area C in Figure 1, pushing against the barricade there.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and

the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a

continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.  This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Figure 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

**B.      Caldwell's Role in the January 6, 2021 Attack on the Capitol**[2]

Caldwell was present on the front lines of the attack shortly after the crowd surged near the inaugural stage construction site at 1:04 p.m.  Against the context of the breach at the Peace Monument at 12:52 p.m., and the rapid build up of rioters confronting police at the West Plaza area of the Capitol, Caldwell was present on the front lines of the main assault for almost the duration of the confrontation.  At approximately 1:00 p.m., a crowd of violent rioters had broken through previously barricaded areas and assembled on the Lower West Terrace, which was off limits to the public at that time.  United States Capitol Police (USCP) officers had formed a line of bike racks extending from the North end of the Lower West Terrace to the South end, to act as a barrier against the crowd. Officers were standing guard behind this line and fending off repeated attempts by the rioters to pull on the bike racks, either with their hands or with ropes and straps, and move forward toward the Capitol.  By 1:12 p.m., Caldwell made his way up to the Lower West Plaza area and was in immediate proximity to the officers trying to barricade off that area from rioters.

**1.      Caldwell's conduct prior to the attack**

The Body Worn Camera (BWC) footage of this incident shows Caldwell confronting and taunting law-enforcement.  At 1:12 p.m., Caldwell was at the LWT in proximity to the officers trying to protect the Capitol from the rioters.

---

[2] Contemporaneously with the filing of this memorandum, the government will submit to the Court all of the videos referenced herein as sentencing exhibits and may play some of them at sentencing.



Figure 5

When the vastly outnumbered officers were trying to protect and defend the Lower West

Terrace part of the Capitol, Caldwell screamed profanities:

Caldwell:        Fuck you, fuck you, fuck you.  Come on.



Figure 6

https://ia804500.us.archive.org/23/items/6u8pBq4eDQBThpyoa/FB_20210106_135438.mpeg4.

Last accessed Dec. 22, 2023, 29:09 elapsed time.

9

> Caldwell:     You all shouldn't have shot him.   You're all on camera.   You all are complicit.   You're all fucking complicit.

*Id.*, at 29:23.   In his debriefing statement to law-enforcement on January 4, 2023, Caldwell stated that he later learned that the name of the person struck, and the person to whom he was referring, was Joshua Black who was hit with a "less-than-lethal plastic projectile" at the Lower West Terrace in the vicinity of Caldwell. *See United States v. Joshua Black*, 1:21-cr-00127-ABJ-1, ECF No. 1 (Complaint and Statement of Facts) and ECF No. 20, pgs. 4-5.



Figure 7

Caldwell was also present as other rioters assaulted and fought with officers.



Figure 8

*Id*, at 29:45 elapsed time.  Caldwell spent the better part of an hour at the pinch point where officers were trying to keep rioters away from the Capitol Building.



Figure 9

During that time, Caldwell repeatedly confronted police officers as they were trying to protect the Capitol.

     

Figure 10                        Fig. 11

A different angle from a distance shows Caldwell at the front of the crowd at the point where the crowd confronts law-enforcement.  *See* Figure Twelve.

11



Figure 12

At one point, Caldwell challenged an officer and said, "go ahead spray again."  This taunt-threat happened more than 20 minutes before Caldwell sprayed the line of officers.



Figure 13

At one point, Caldwell said in proximity to an MPD officer "lock the fucking doors."

12



Figure 14

At another point, an MPD officer's microphone picks up Caldwell saying, "spray it again."



Figure 15

At 1:45 p.m. he asked an officer, "are you scared man?"



Figure 16

13

At 2:00 p.m., Caldwell can be seen using his walkie talkie.



Figure 17

A black Baofeng radio was collected from Caldwell's residence on February 10, 2021.

**2.      Caldwell's attack on police**

At approximately 2:05 p.m., Caldwell walked up the steps towards a group of police officers forming a line to protect the U.S. Capitol at the Lower West Terrace. He then pointed a canister of a gaseous chemical irritant at the officers and fired it directly at them. The irritant gas struck the officers.  *See* Figure 17.

14



Figure 18

Caldwell was captured shooting the gaseous irritant at the officers on video from multiple angles and multiple sources.  *See* Body Worn Camera screen capture, Figure 19.



Figure 19

*See* also, BWC video from another officer, Figure 20.



Figure 20

Caldwell was also captured on video by in independent YouTube vlogger, and that video was uploaded to YouTube under the title "Storm The Capital w/ dream floral."  *See* Figure 21.



Figure 21

Acting pursuant to a search warrant lawfully obtained, FBI agents seized the camouflage backpack with unique patch and a black Baofeng radio that Caldwell carried on January 6, presumably from his residence. Agents also seized the dark tinted sunglasses from Caldwell's vehicle.  An FBI Special Agent testified that those sunglasses were specialized gear to create a protective barrier from things harming the eye. Order of Detention at 4, *United States v. Caldwell*,

16

21-MJ-00107-KPJ (E.D. Tex. March 5, 2021), ECF No. 11. Caldwell came prepared to the Lower West Terrace area not just with pepper spray/mace, but also with protective gear to protect his eyes, knowing full well his activities might involve him getting sprayed in return. At the time of his arrest, he was wearing the wearing the 5.11 hoodie, which he was wearing on January 6, 2021 at the Capitol.

The officers sprayed suffered a number of injuries.  Fortunately, none were permanent. They included:  (1) one officer's vision was impaired (until the next day) by the pepper spray and the spray caused her to cough, (2) another officer had difficulty breathing, vomited, and had burned skin and a burned eye from the spray, (3) another officer experienced pain and temporary vision impairment from the spray, and (4) another officer experienced severe skin irritation, severe pain, and eventual hospitalization as a result of the spray that was transferred onto his skin.  *See* Pre-Sentence Report, dated December 2, 2022, ¶ 26.

### 3.    Caldwell's post-attack conduct

More than an hour after he assaulted the officers by spraying them, Caldwell made his way up to the Upper West Terrace and into the U.S. Capitol itself.  At 3:06:04 pm, Caldwell was standing in front of another line of officers near the Senate Wing door.



Figure 22

A few minutes later, at 3:08 pm, he made entry into the Capitol Building itself as part of a mob of rioters through the Senate Wing door, where they overwhelmed a heavily outnumbered group of police officers.



Figure 23

After approximately two minutes, Caldwell left the Capitol Building.



Figure 24

### 4.     Caldwell's Statements after the Riot

Caldwell showed no remorse for his crimes in the immediate aftermath of the riot. To the contrary, he reveled in those crimes.  On January 6, 2021, at the Renaissance Hotel where he was staying, Caldwell gave an interview about the events that day.  In that interview, Caldwell was wearing the same clothing he was seen wearing earlier that day, this time with a red sticker on the left breast that read "Guns SAVE Lives."  Caldwell said that "ten minutes after we started storming, a big fight broke out" and a female was hit in the neck. Caldwell said that individuals stayed in the area and police were spraying mace towards him.

Caldwell then threatened the officers using spray to deploy the individuals in the area and meant to disperse the angry crowd by yelling back to them, in his words, "Dude, do it again and we'll spray you back."  He said they did, and he sprayed back and, again in his own words, "I got like 15 of them." Caldwell stated that officers then shot him with a big cannon with rubber bullets. This showed a complete lack of respect for the role of police, in which officers were attempting to

stymie further chaos on the scene and Caldwell responded with further violence and anger. *See* Figures 20 and 21.





*Figure 25*                              *Figure 26*

## III.   THE CHARGES AND PLEA AGREEMENT

Caldwell was arrested in Texas on February 10, 2021. He appeared before Magistrate Judge Kimberly C. Priest Johnson in a detention hearing which started on February 22, 2021 and was continued to March 4, 2021. Judge Johnson issued an order of detention pending trial and a commitment to another district while Caldwell was remanded to the custody of the U.S. Marshals for transport to the District of Columbia.

On March 3, 2021, an indictment was returned with respect to Caldwell, charging him with the following seven counts:

1. Obstruction of Law Enforcement During Civil Disorder (18 U.S.C. § 231(a)(3)) (5 year maximum prison sentence);
2. Inflicting Bodily Injury on Certain Officers (18 U.S.C. § 111(a)(1), and (b)) (20 year maximum prison sentence);
3. Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority

with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(1), (b)(1)(A)) (10 year maximum prison sentence);

4. Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(2), (b)(1)(A)) (10 year maximum prison sentence);

5. Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(4), (b)(1)(A)) (10 year maximum prison sentence);

6. Violent Entry and Disorderly Conduct on Capitol Grounds (40 U.S.C. § 5104(e)(2)) (6 month maximum prison sentence)

7. Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F)) (6 month maximum prison sentence).

On September 26, 2022, Caldwell pleaded guilty to Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).

## IV.    STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, Caldwell faces up to twenty years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for his violation of 18 U.S.C. § 111(a)(1) and (b).

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

21

Consistent with the parties' stipulation in the plea agreement, the U.S. Probation Office correctly calculated Caldwell's offense level as follows:

| | |
|---|---|
| Base Offense Level: U.S.S.G. §2A2.2(a) | 14 |
| Use of a Dangerous Weapon: U.S.S.G. §2A2.2(b)(2)(B) | +4 |
| Bodily Injury to Victim: U.S.S.G. §2A2.2(b)(3)(A) | +3 |
| Conviction for 18 USC §111(b): U.S.S.G. §2A2.2(b)(7) | +2 |
| Official Victim: U.S.S.G. §3A1.2(a)(1) and (2) | +6 |
| Adjusted Offense Level (Subtotal): | 29 |
| Acceptance of Responsibility: U.S.S.G. §3E1.1((a) and b) | -3 |
| Total Offense Level: | 26 |

PSR ¶¶ 30-41.

That was consistent with the Guidelines calculations stipulated by the parties in their plea agreement. ECF No. 56, ¶ 5.

Probation also determined that Caldwell's criminal history category was I, based on one criminal history point for a 2008 conviction for driving while intoxicated and two other convictions for DUI and disorderly conduct that did not result in criminal history points. PSR ¶¶ 42-46. The government does not dispute that determination. Accordingly, Caldwell's Guidelines imprisonment range is 63 to 78 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

22

A.        **Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to government officials, police officers and, of course, our democratic norms. It was one of the only times in our Nation's history when the Capitol building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. While each defendant should be sentenced based on his or her own conduct, each individual person who entered the Capitol grounds on January 6 did so as part of a larger crime to which his or her personal conduct directly contributed. Caldwell, who helped breach the police line, assaulted multiple officers, and impeded police officers, aided and abetted those who entered the Capitol and committed other crimes therein.

While looking at Caldwell's individual actions, this Court, in considering the sentencing factors under 18 U.S.C. § 3553(a), should look to a number of critical factors, including: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged or engaged in violence; (3) whether the defendant encouraged or engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, deceived, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

In light of these factors, and as reflected in the Sentencing Guidelines, a significant

sentence of incarceration is warranted.  Caldwell assaulted multiple officers protecting the Capitol, and also entered the Capitol Building itself.  He taunted and berated police multiple times.  He made clear, in antagonizing and taunting officers, that violence was his goal.

It is significant that Caldwell spent a substantial period of time at the Lower West Terrace, the area of greatest violence at the Capitol.  Caldwell was first picked up on an Officer's BWC at approximately 1:12 pm.  Caldwell assaulted the officers almost an hour later, at 2:05 pm.  Caldwell spent almost the entire time between his appearance at the barricades at the LWT until the assault at the front line of the confrontation at the forefront of the battle line between police and the rioters.

The assaults and attacks at the Lower West Terrace and the Lower West Plaza occupied the greatest law-enforcement resources on January 6, 2021.  Put simply, by occupying and engaging law-enforcement resources and personnel at the LWT Plaza area at around 2:00 p.m., other parts of the Capitol were critically understaffed with law-enforcement.  That lack or resources directly and indirectly resulted in the U.S. Capitol being overrun with rioters as significant tactical breaches occurred on the East side of the Capitol at during that timeframe.

**B.  Caldwell's History and Characteristics**

Caldwell is a veteran of the U.S. Marine Corps.  He has two prior criminal convictions for driving while impaired, and one for disorderly conduct. While the Presentence Report suggests that Caldwell's prior military history might be considered as a mitigating factor and may support a downward variance from the Sentencing Guidelines range (PSR ¶ 148), the government submits that Caldwell's military service has aggravating features, a "double-edged sword" as it were, that further supports a sentence at the midpoint of the Guidelines range.

Caldwell was not a member of the military at the time of his crimes.  But he has used his

status as a veteran as both a sword (providing him the skills to participate in the January 6 riot) –
and a shield (using his service to deflect responsibility). Given those circumstances, this Court
should not treat Caldwell more leniently because he once took an oath to defend the Constitution
years before subverting it.

Caldwell misused his training and service when he used his skills to battle police.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack
on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6
showed a blatant and appalling disregard for our institutions of government and the orderly
administration of the democratic process."[3] As with the nature and circumstances of the offense,
this factor further supports a significant sentence of incarceration. Caldwell's criminal conduct,
assaulting multiple police officers resulting in the stoppage of the certification of a Presidential
election, is the epitome of disrespect for the law.  Caldwell knew that Members of Congress and
the police officers who tried to protect them were under siege.  He attended the rally for then
President Trump and was present when he encouraged attendees to march to the Capitol, he was
part of the siege, part of the collective action that held Members hostage and put them in fear for
their lives. Caldwell participated in an attack on the rule of law. A lesser sentence would suggest
to the public, in general, and other rioters, specifically, that attempts to obstruct official
proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House
Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"),
available          at          https://oversight.house.gov/sites/democrats.oversight.house.gov/files/
Wray%20Testimony.pdf

could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### *General Deterrence*

A significant sentence of imprisonment is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Caldwell has some history of violent crime: a previous assault charge which resulted in a disorderly conduct conviction.  And yet, for many of the January 6 defendants, the question is not whether they will commit future violence *in general*. Instead, the question is whether they pose a risk of future political violence: whether, faced with an election result they do not like, they will gather with other like-minded individuals and try—once again—to overturn a legitimate process by force. Democracy, after all, depends on

---

[4] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

the consent of both winners and losers. It depends on our common commitment to a process that is more important than any one single outcome.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Caldwell and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111(a)(1) and (b) defendants prior

27

to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

This case bears some similarities to others in which defendants were convicted by guilty pleas of assaulting police officers during the riot at the Capitol on January 6, 2021 using chemical sprays, but the government notes that Caldwell is the first defendant to be sentenced for a violation of § 111(a)(1) and (b) for using a chemical spray.  In other spray assault cases, Courts have imposed lengthy sentences of incarceration.  *See United States v. Mattice*, 1:21-cr-657-1 (BAH) (44 months – violation of § 111(a)(1)), *United States v. Mault*, 1:21-cr-657-1 (BAH) (44 months – violation of § 111(a)(1)), and *United States v. Wilden*, 1:21-cr-657-1 (BAH) (24 months – violation of § § 111(a)(1)).

The government notes that the quality and quantity of spray irritant used by Caldwell far exceeds that of other defendants sentenced to date.  It is clear from the images and the effects of the spray that Caldwell used bear spray or some other similar irritant:



Figure 28



Figure 29                                    Figure 30

In stark contrast, defendant Mattice was captured on video using a much smaller, and less potent, chemical irritant.



*Figure 11: Mattice discharges chemical spray at Officer M.A. and other officers inside the LWT tunnel.*

Figure 31

Further, one of the officers assaulted by Caldwell remarked that she knew "the orange spray to be

29

bear spray." She further noted that the "spray caused severe pain, anger, and temporary vision impairment. It took around 10 minutes for [her] to recover enough from the spray to return to the police line." The magnitude of Caldwell's assaults also dwarfs that of the other sprayers. By his own admission, Caldwell claims to have sprayed fifteen officers. This estimate is borne out by the BWC video capturing the assault and the officers affected.



Figure 32

More disturbing, the officers sprayed were the front line officers battling the rioters at the Lower West Terrace Plaza.

Indeed, in some other assault cases, courts have imposed sentences similar to that requested by the government, here. *E.g.*, *United States v. Ponder*, 1:21-cr-00259-TSC (63 months' incarceration). Judges of this Court have imposed Guidelines-range sentences for assaults on police officers in several January 6 cases. E.g., *United States v. Rubenacker*, 1:21-cr-193 (BAH) (41 months' incarceration); *United States v. Creek*, 1:21-cr-645 (DLF) (27 months of incarceration); *United States v. Thompson.* 1:21-cr-461 (RCL) (46 months of incarceration); *United States v. Fairlamb*, 1:21-cr-120 (RCL) (41 months of incarceration); *United States v. Palmer*, 1:21-cr-328 (TSC) (63 months of incarceration). In others, the sentencing judges have

varied downward from the Guidelines range based on factors that may not apply here. [5] *E.g.*, *United States v. Miller*, 1:21-cr-75 (RDM) (33 months of incarceration); *United States v. Languerand*, 1:21-cr-353 (JDB) (44 months of incarceration).

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[6] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[5] *Languerand*, Sent. Tr. at 39, Jan. 26, 2022 (varying downward due to the defendant's difficult childhood and acknowledgement and regret for violent conduct); *Miller*, Sent. Tr. at 73-74, May 23, 2022 (varying downward due to the defendant's age, intoxication, and "exemplary record" before January 6, 2021). Additionally, in *United States v. Leffingwell*, 1:21-cr-5 (ABJ), the court varied downward due to defendant's expressions of remorse, multiple traumatic brain injuries, and the effect his conviction and sentences would have on his disability benefits. Sent. Tr. at 39-56, Feb. 10, 2022.

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The victims in this case do not claim or seek financial restitution from Caldwell, although they suffered physical injury on January 6, 2021. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Caldwell must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Caldwell played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Caldwell's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 129.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 70 months, three years of supervised release, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

 */s/ James D. Peterson*

James D. Peterson
Special Assistant United States Attorney
Bar No. VA 35373
United States Department of Justice
1331 F Street N.W. 6th Floor

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Washington, D.C. 20530
Desk: (202) 353-0796
Mobile: (202) 230-0693
James.d.peterson@usdoj.gov